1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    MAXIM I PROPERTIES,                         Case No. 12-cv-00449-DMR

8                    Plaintiff,
                                                 **ORDER DENYING MOTION FOR**
9            v.                                  **GOOD FAITH SETTLEMENT**

10   A.M. BUD KROHN, et al.                      Re: Dkt. No. 282

11                   Defendants

12

13          This matter involves recovery of costs to address environmental contamination at a

14   property in San Jose, California.  Now pending is a motion for determination of good faith

15   settlement between Plaintiff Maxim I Properties ("Plaintiff") and Defendant Moyer Products

16   ("Moyer") (together, "Settling Parties").  [Docket Nos. 282 ("Mot."); 316 ("Reply").]  Cross-

17   Defendant/Counterclaimant Renesas Electronics America Inc. (formerly known as Integrated

18   Device Technology, Inc.) and Cross-Defendants Central Coating Company, Inc.; The Sherwin-

19   Williams Company; Telewave Inc., and Thermionics Laboratory, Inc. (together, "Non-Settling

20   Parties") all oppose this motion.  [Docket No. 313 ("Opp'n").][1]  The court held a hearing on the

21   motion on May 12, 2022.  For the following reasons, the motion is denied.

22

23

24

25   [1] As discussed below, Moyer Products voluntary dismissed its crossclaims against other parties
     that were previously in this action.  Three additional cross-defendants Spraytronics, A.M. Bud
26   Krohn, and National Auto Recovery Bureau, Inc. (together, "Additional Parties") did not join the
     Non-Settling Parties' brief or appear at the hearing; accordingly, they have waived any
27   opportunity to object to the motion.  All parties have consented to the jurisdiction of a magistrate
     pursuant to 28 U.S.C. § 636(c).  [Docket Nos. 177, 179.]
28

United States District Court
Northern District of California

I. **BACKGROUND**

   A. **Factual History**

   The following facts are uncontested unless otherwise noted.  This case arises out of the contamination of a parcel of real property located at 1300-1310 Old Bayshore Highway in San Jose (the "Property").  From 1947 to 1982, Moyer operated a pesticide and fertilizer business on the Property.  Mot. at 2; Opp'n at 2.  Plaintiff asserts that during that time, Moyer blended, stored, packaged, and distributed pesticides and weed killers on the Property.  Mot. at 1; *see also* Compl. ¶ 33 [Docket No. 1.]  In 1977, the California Regional Water Quality Control Board ("RWQCB") inspected the facility and found significant soil and groundwater contamination across the Property due to the presence of hazardous pesticides and solvents.  Compl. ¶ 42; Declaration of Anthony C. Ward ("Ward Decl.") ¶ 6 [Docket No. 313-5.]  The Board issued an enforcement order with which Moyer only partially complied.  Compl. ¶¶ 42-43; Ward Decl. ¶ 6.

   In 1982, Moyer's stock was sold to new owners who ceased operating the facility.  Mot. at 2.  Moyer dissolved after going bankrupt.  Mot. at 2; Opp'n at 3.  A new entity C.L. Scott Enterprises, doing business as Ultra-Chem International, Inc. ("Ultra-Chem"), operated a hazardous waste transfer and reclamation business on the Property from 1982 to 1986.  Mot. at 2; Opp'n at 3.  The site was then purchased by National Auto Recovery Bureau, owned by A.M. Bud Krohn, which operated an auto body shop from 1986 to 1993.  Mot. at 2; Opp'n at 3.  Thereafter, the Property was sold to Saeed F. and Cecilia B. Oskoui and to Enviro-Tech Business and Development, Inc. and its owner Kamal Farshi.  Mot. at 2; Opp'n at 3; *see* Compl. ¶¶ 38-39.[2]  In 2002 or 2003, Enviro-Tech sold the Property to Plaintiff.  At the time of the purchase, Plaintiff asserts that it was unaware of the hazardous waste contamination on the Property.

   Around 2003—and after the purchase—Plaintiff received notice from the California Department of Toxic Substances Control ("DTSC") and learned that the Property was formerly a transfer site for hazardous waste.  Declaration of Gregory P. O'Hara ("O'Hara Decl.") ¶ 2 [Docket

---

[2] The motion does not mention the intervening Oskoui transaction but that fact is not material to this dispute.

2

United States District Court
Northern District of California

United States District Court
Northern District of California

No. 282-2.]  In 2007, Plaintiff filed a state court action to rescind the Property sale against the previous owner Enviro-Tech, claiming that the contamination was not properly disclosed.  Mot. at 2; Opp'n at 3-4; *see* Declaration of Beth B. Koh ("Koh Decl.") Ex. 2 (Complaint, *Maxim I Prop. v. Enviro-Tech Bus. & Develop., Inc.*, No. 107CV-086707 (Santa Clara Cty. Super. Ct. filed May 25, 2007 (hereinafter "State Court Action")).  Plaintiff was awarded a default judgment rescinding the Property sale in 2012.  Mot. at 2-3; O'Hara Decl. ¶ 2; Koh Decl. Ex. 3.  Since then, the previous owners have leased the Property to Plaintiff.  Mot. at 3; Opp'n at 4.[3]  Plaintiff also conducted its own investigation of the contamination at the Property and provided its findings to the DTSC; how much investigation took place and whether its findings were material to DTSC's own investigation is a key disputed fact addressed below.  *See* O'Hara Decl. ¶ 3; Supplemental Declaration of Gregory P. O'Hara ("Suppl. O'Hara Decl.") ¶¶ 3-7 [Docket No. 316-2]; *see* Declaration of Joshua A. Bloom ("Bloom Decl.") ¶ 7 [Docket No. 313-8].

In 2012 the DTSC initiated an Enforcement Order for Corrective Action related to hazardous contamination at the Property against some 60 respondents.  Mot. at 3; Opp'n at 4; *see* Suppl. O'Hara Decl. Ex. D (*Ultra-Chem*, Enforcement Order for Corrective Action, No. HWCA: P2-11/12-007 (Cal. Dep't of Toxic Substances Control May 2, 2012) ("DTSC Enforcement Order")).[4]  Included as respondents in the DTSC Enforcement Order are Plaintiff, Moyer, and Non-Settling Parties except for Renesas and its former entity Integrated Device Technology.  DTSC Enforcement Order        §§ 2.2.1-2.2.3.  At the hearing, Renesas's counsel clarified that

---

[3] As Plaintiff's counsel conceded at the hearing, because of the rescission effectuated in state court, Plaintiff is deemed to have never owned the Property.  *See DuBeck v. Cal. Physicians' Serv.*, 234 Cal. App. 4th 1254, 1264 (2015) ("Rescission extinguishes a contract, rendering it void *ab initio,* as if it never existed.").  At the hearing, counsel stated that Enviro-Tech and Farshi are the current owners of the Property; they lease it to an entity called 1300 Old Bayshore, which is sub-leasing the property to two affiliate entities, one of which is Plaintiff.  None of this factual background is in the record, nor is there any record evidence establishing that Plaintiff has a current possessory interest in the Property.

[4] The Supplemental O'Hara Declaration only included an excerpt of DTSC Enforcement Order.  The full order is available at https://envirostor.dtsc.ca.gov/public/deliverable_documents/4769788980/UltraChem%20CA%20Order%20Final%20050212.pdf

1    Renesas is part of the 2013 DTSC Consent Agreement discussed below.  In its Enforcement

2    Order, the DTSC found that "[f]rom approximately 1950 until approximately 1982, Moyer

3    Chemical Company operated a pesticide manufacturing plant which produced pesticides,

4    fungicides, insecticides, and weed killers," and now "Respondent Maxim I Properties . . . currently

5    owns the Facility." *Id.* §§ 2.1.1, 2.3.  The DTSC also found that 54 respondents, described as the

6    "Generators," generated hazardous waste that was transported to the Property during its Ultra-

7    Chem ownership phase.  *Id.* § 2.3; *see also* Opp'n at 4; Ward Decl. ¶ 7.

8        In early 2013, DTSC entered into a Corrective Action Consent Agreement with certain

9    respondents, which Settling Parties call the "potentially responsible parties ('PRP Group')." Mot.

10   at 3.  The Consent Agreement is not in the record, but Non-Settling Parties aver that

11   approximately 36 respondents to the Consent Agreement are presently active members of a

12   "Generator Joint Defense Group" (the "Generators"), of which five Non-Settling Parties are also

13   members.  *Id.*; *see* Ward Decl. ¶ 7.  The DTSC is now evaluating a remediation plan, known as the

14   Final Corrective Measures Study ("FCMS").  Mot. at 3; Opp'n at 6; *see* 5/24/2022 Status Report

15   [Docket No. 322.]  The actual cost to remediate the Property is a subject of controversy, as

16   discussed below.  It is also difficult to estimate at this time, given that the DTSC has not yet

17   approved a remediation plan.

18       **B.    This Lawsuit**

19       On January 27, 2012, Plaintiff filed a complaint for injunctive relief and damages against a

20   number of entities associated with the Property including previous owners, tenants, and third

21   parties involved in generating, transporting or disposing hazardous waste to the Property.  *See*

22   *generally* Compl. ¶¶ 2-30 [Docket No. 1.]  Plaintiff alleged violations of the federal

23   Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the

24   Resource Conservation and Recovery Act ("RCRA"), the California Hazardous Substance

25   Account Act ("HSAA"), nuisance claims, implied equitable indemnity and contribution, and

26   declaratory judgment.  Plaintiff also sought contractual indemnity against a former shareholder of

27   Moyer.  As counsel clarified at the hearing, Plaintiff subsequently dismissed and no longer has any

28

United States District Court
Northern District of California

4

1   claims except those against Moyer.  [Docket Nos. 100, 108, 122, 134, 139, 141, 142.][5]

2           On April 2, 2012, Moyer filed counterclaims against Plaintiff and cross-claims for

3   contribution against all Defendants under CERCLA, HSAA, and California Health and Safety

4   Code section 25325.5(a), and against Defendants Krohn and National Auto Recovery Board

5   ("NARB") for indemnity.  [Docket No. 41.]  Moyer has since voluntarily dismissed its claims

6   against so-called generators Aim Spray, Inc., Printed Circuit Technology, Country Club Cleaners,

7   Inc., ENS Technology, McCal Company, Space Systems/Loral, Inc., MC&L, Inc., Burke

8   Industries, Greyhound Lines, Component Finishing, Nu-Metal Finishing, Ray Starn, Inc., BR&F

9   Spray, Inc., QIP, JR Inc., Serra Corp., and Ultra-Chem.  [Docket Nos. 100, 173, 294-305.]  Moyer

10  has live cross-claims against the Settling Parties and the Additional Parties—namely, A.M. Bud

11  Krohn, Central Coating Company, National Auto Recovery Bureau, Renesas, Spraytronics,

12  Telewave, Thermionics Laboratories, and The Sherwin-Williams Company.  [Docket No. 308 at

13  4.]

14          On April 20 and 26, 2012, Defendant Renesas Electronics America filed counterclaims

15  against Plaintiff and Moyer for contribution under CERLCA.  [Docket Nos. 93, 94.]   As all

16  counsel stated at the hearing, Renesas has a live claim against Moyer for contribution under

17  CERCLA.

18          On February 21, 2013, the Honorable Paul S. Grewal, who was then presiding over this

19  case, stayed the lawsuit after the parties represented that litigation could not proceed while the

20  DTSC's evaluation of the Corrective Measures Study was pending and until the DTSC had

21  approved a remediation plan.  [Docket No. 194.]  In June 6, 2016, the suit was transferred to the

22  undersigned.  [Docket No. 231.]  The parties have since submitted periodic status reports.

23          As of today, in accordance with the docket, the parties' March 4, 2022 Status Report

24  (Docket No. 308), and counsel's representations on the record, the current status of the pleadings

25

26  ───────────────

27  [5] The motion erroneously states that Plaintiff also did not dismiss its claims against Aviza
    Technology International, Inc., but the docket reflects that Plaintiff in fact filed a voluntarily
    dismissal against that entity on May 22, 2012.  [Docket No. 108.]  Counsel confirmed this at the

28  hearing.

United States District Court
Northern District of California

is as follows.  Maxim has claims under federal and state law against Moyer only.  Moyer has a claim for contribution against Maxim and cross-claims for contribution and indemnity against Non-Settling Parties and Additional Parties.  Renesas has a cross-claim against Moyer for contribution.

### C.        Settlement Agreement and the Pending Motion

In December 2021, Settling Parties reached a conditional settlement agreement contingent upon the court's order on this motion.  *See* O'Hara Decl. Ex. A ("Agreement").  The relevant terms of the Agreement are summarized as follows:

1.  Moyer agrees to pay Plaintiff, through its insurers, a total of $1,700,000 as a reimbursement for damages and costs incurred in responding to the DTSC Action, the State Court Action, and this lawsuit.  Agreement ¶ 1(a).

2.  In exchange, Plaintiff will not object to remediation proposals made by Moyer or jointly by Moyer and third parties in connection with the DTSC's action.  *Id.* ¶ 3.

3.  Plaintiff and Moyer agree to dismiss all claims, crossclaims, and counterclaims against one another and release all past, present, and future claims.  *Id.* ¶¶ 2-3.

4.  The parties will jointly file this motion for good faith settlement agreement.  *Id.* ¶ 4.  The Agreement sets forth the terms of the proposed court order.  *Id.*  Effectuation of the Agreement is contingent on the court's order on this motion.  *Id.* ¶¶ 1, 4.

Plaintiff attests that Settling Parties reached the Agreement after extensive negotiations and private mediation, and that it considered the factual record, potential litigation risks, and the avoidance of substantial costs of fact and expert discovery, preparing for trial, and trying the case.  O'Hara Decl. ¶¶ 5-6.  Plaintiff also attests (albeit through an inadmissible hearsay statement, discussed below) that "[c]ounsel for Moyer's insurer informed me that with the Settlement Agreement, Moyer's policy limits will be exhausted."  *Id.* ¶ 7.

Settling Parties now move for a good faith determination of the Agreement pursuant to California Code of Civil Procedure sections 877 and 877.6.  If approved, the court's order would bar any outstanding claims for contribution or indemnity.  Subsequently, Settling Parties narrowed the scope of the contribution and indemnity bar to apply only to parties with claims in this case:

United States District Court
Northern District of California

1   Plaintiff, Moyer, A.M. Bud Krohn, Central Coating Company, National Auto Recovery Bureau,

2   Renesas, Spraytronics, Telewave, Thermionics Laboratories, and The Sherwin-Williams

3   Company.  [Docket Nos. 308 at 3, 308-1 ("Amended Proposed Order") at 2.]  Plaintiff's and

4   Moyer's claims against each other would be extinguished.  Amended Proposed Order at 2-3; *see*

5   *also* Agreement ¶ 2.  Furthermore, although the submissions are vague on this point, the court's

6   order would bar Moyer's cross-claims against A.M. Bud Krohn, Central Coating Company,

7   National Auto Recovery Bureau, Renesas, Spraytronics, Telewave, Thermionics Laboratories, and

8   The Sherwin-Williams Company.  *See* Amended Proposed Order at 2; Reply at 5 ("Approval of

9   the Joint Motion will result in dismissal of all claims against all cross-defendants by the Settling

10  Parties, including Opposing Parties").[6]

## II.   LEGAL STANDARDS

### A.   Good Faith Determination of Settlement

A settling party in a federal action involving California claims may move for a good faith

determination of settlement under California Code of Civil Procedure sections 877 and 877.6,

which govern settlements among joint tortfeasors.  *Fed. Savings & Loan Ins. Corp. v. Butler*, 904

F.2d 505, 511 (9th Cir. 1990).  A good faith settlement of claims against "one or more of a number

of tortfeasors claimed to be liable for the same tort" will not "discharge any other such party from

liability unless its terms so provide, but it shall reduce the claims against the others."  Cal. Code

Civ. Proc. § 877(a).  It will also effectively "discharge the party to whom it is given from all

liability for any contribution to any other parties."  *Id.* § 877(b).  If the court determines the

---

[6] Settling Parties' statement that if "the motion is granted, the Opposing Parties will be dismissed from the case" is not reflected in the Agreement.  *See* Reply at 5.  The Agreement does not specify that Moyer will dismiss its cross-claims or that Moyer releases those claims.  *See* Agreement ¶ 3 ("Maxim and Moyer each expressly acknowledge and agree that nothing in this Agreement is intended, and shall not, release or extinguish or modify in any way any claims or causes of action against any person, party, entity, corporation, company, partnership or enterprise (including without limitation the various parties to the Maxim Federal Action . . . ) except Maxim and Moyer.").  However, the parties' requested order would cover "[a]ny and all claims by active litigants in this case for contribution or indemnity," with "active litigants" defined as including Moyer.  Amended Proposed Order at 2.  In other words, if this order is entered, Moyer's cross-claims apparently would be *barred*, not dismissed.  Settling Parties do not explain whether Moyer also intends to dismiss its cross-claims nor do they address the effect of the indemnity bar on Moyer's own cross-claims.

United States District Court
Northern District of California

settlement is made in good faith, its order "bars any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.'" *Id.* § 877.6(c); *John Hancock Mut. Life Ins. Co. v. Setser*, 42 Cal. App. 4th 1524, 1529 (1996). Sections 877 and 877.6(c) are aimed at two objectives: "equitable sharing of costs among the parties at fault, and . . . encouragement of settlements." *Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 38 Cal. 3d 488, 494 (1985). "The good faith provision of section 877 mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives." *Id.*; *see also Butler*, 904 F.2d at 511 ("The obvious purpose of this statute is to determine at an early state what effect, if any, a settlement has on the setoff against other defendants and on contribution rights.").

The good faith requirement, "which a settling defendant must satisfy to invoke the statutory bar against indemnity claims, was imposed primarily to protect the interests of non-settling defendants." *City of Grand Terrace v. Super. Ct.*, 192 Cal. App. 3d 1251, 1263 (1987). "When evaluating whether the parties reached a settlement in good faith, a trial court must examine not only the settling tortfeasor's potential liability to the plaintiff, but also the settling tortfeasor's potential liability to all nonsettling tortfeasors." *PacifiCare of Cal. v. Bright Med. Assocs., Inc.*, 198 Cal. App. 4th 1451, 1465 (2011).

Any party is entitled to a hearing on the issue of a good faith settlement; however, a settling party may proactively file a motion for good faith determination of the settlement. Cal. Civ. Proc. Code § 877.6(a). The application must "indicate the settling parties, and the basis, terms, and amount of the settlement." *Id.* § 877.6(a)(2).

In conducting the good faith inquiry, the court must assess "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech-Bilt*, 38 Cal. 3d at 499. A good faith settlement is one in which "defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." *Id.* "To determine whether a settlement has been made in good faith, California

United States District Court
Northern District of California

courts consider (1) 'a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability'; (2) 'the amount paid in settlement'; (3) 'the allocation of settlement proceeds among plaintiffs'; and (4) 'a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial.'" *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1064 (9th Cir. 2011) (quoting *Tech-Bilt*, 38 Cal. 3d at 499) (the "*Tech-Bilt* factors"). "The first two factors are the most important." *Cooper Drum Cooperating Parties Grp. v. Am. Polymers Corp.*, No. CV-19-03007, 2020 WL 2504331, at *4 (C.D. Cal. May 13, 2020). "The California Supreme Court also held that '[o]ther relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants.'" *Mason & Dixon*, 632 F.3d at 1064 (quoting *Tech-Bilt*, 38 Cal. 3d at 499). "[W]hen the good faith nature of a settlement is disputed, it is incumbent upon the trial court to consider and weigh the *Tech-Bilt* factors." *Grand Terrace*, 192 Cal. App. 3d at 1261.[7]

A party opposing a motion for good faith settlement carries the burden to establish a lack of good faith and "must demonstrate . . . that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." *Tech-Bilt*, 38 Cal. 3d at 499-500; *see* Cal. Civ. Proc. Code § 877.6(d). "If contested, declarations by the non-settlor should be filed which in many cases could require the moving party to file responsive counterdeclarations to negate the lack of good faith asserted by the non-settling contesting party." *Grand Terrace*, 192 Cal. App. 3d at 1262; *see* Cal. Civ. Proc. Code § 877.6(b). "A good faith determination under Cal. Code Civ. Proc. § 877.6 is both fact-sensitive and discretionary." *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1504 (9th Cir. 1994); *see also Whitehurst v. Heinl*, No. 09-CV-04808-MEJ, 2015 WL 1738385, at *3 (N.D. Cal. Apr. 14, 2015) ("The determination as to whether a settlement is made in good faith is a matter within the court's discretion").

---

[7] Both parties agree that the *Tech-Bilt* factors apply in this case.  Mot. at 5; Opp'n at 2.

United States District Court
Northern District of California

1    **B.      CERCLA Settlements**

2        "Congress enacted CERCLA in 1980 . . . 'in response to the serious environmental and

3    health risks posed by industrial pollution.'"  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710

4    F.3d 946, 956 (9th Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556

5    U.S. 599, 602 (2009)).   In enacting the law, Congress intended "to provide for liability,

6    compensation, cleanup, and emergency response for hazardous substances released into the

7    environment and the cleanup of inactive hazardous waste disposal sites." *Carson Harbor Vill. v.*

8    *Cty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).  Congress also intended to "ensure that

9    polluters were held responsible for the cleanup efforts, and encourage settlement through specified

10   contribution protection." *Chubb*, 710 F.3d at 956.  The Ninth Circuit "construes CERCLA

11   liberally to effectuate the statute's two primary goals: '(1) to ensure the prompt and effective

12   cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances

13   bear the cost of remedying the conditions they created.'" *City of Los Angeles v. San Pedro Boat*

14   *Works*, 635 F.3d 440, 447 (9th Cir. 2011).

15       CERCLA section 107 "allows private parties who incur cleanup costs to recover those

16   costs from 'various types of persons who contributed to the dumping of hazardous waste at a

17   site.'" *Carson Harbor*, 433 F.3d at 1265 (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d

18   1149, 1152 (9th Cir. 1989)); *see* 42 U.S.C. § 9607.  So-called "potentially responsible parties"

19   may be held strictly liable "for the cleanup of environmental hazards, irrespective of whether they

20   directly contributed to the contamination." *Chubb*, 710 F.3d at 961.  "CERCLA also authorizes a

21   responsible party who has incurred liability under § 9607(a) to bring an action for contribution

22   under § 9613(f)(1) against any other potentially responsible party." *AmeriPride Servs. Inc. v.*

23   *Texas E. Overseas Inc.*, 782 F.3d 474, 480 (9th Cir. 2015).  "'Contribution' is not defined in

24   CERCLA, but is interpreted to mean 'the tortfeasor's right to collect from others responsible for

25   the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being

26   determined as a percentage of fault.'" *Id.* (quoting *United States v. Atl. Rsch. Corp.*, 551 U.S. 128,

27   138 (2007)).  "In resolving contribution claims, the court may allocate response costs among liable

28   parties using such equitable factors as the court determines are appropriate." *Id.* (quoting 42

United States District Court
Northern District of California

U.S.C. § 9613(f)(1)). "CERCLA does not limit the equitable factors a court may consider." *Id.*

"[O]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation." *Chubb*, 710 F.3d at 971 (quoting *Cal. Dep't of Toxic Substances Control v. City of Chico*, 297 F. Supp. 2d 1227 (E.D. Cal. 2004)); *see United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746 (9th Cir. 1995) (referring to "CERCLA's policy of encouraging early settlements"). Consistent with this purpose, "a party who has resolved its CERCLA liability through a judicially approved consent decree 'shall not be liable [to other responsible parties] for claims for contribution regarding matters addressed in the settlement.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014) (quoting 42 U.S.C. § 9613(f)(2) (alterations in original). To approve a CERCLA settlement, "a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *Id.* at 1011-12 (quoting *Montrose*, 50 F.3d at 748); *see San Diego Unified Port Dist. v. Gen. Dynamics Corp.*, No. 07-CV-01955-BAS-WVG, 2017 WL 2655285, at *6 (S.D. Cal. June 20, 2017) (applying the same standards to CERCLA settlements involving private parties). The court "must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *City of Tucson*, 761 F.3d at 1012 (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)) (alterations in original). In so finding, the court must "independently 'scrutinize' the terms of a settlement," "determine the proportional relationship between the [settlement amount] to be paid by the settling defendants and the [plaintiff's] current estimate of total potential damages" and assess "the fairness of that proportional relationship in light of the degree of liability attributable to the settling defendants." *Montrose*, 50 F.3d at 747. "A district court abuses its discretion where it does not fulfill its obligation to engage in this comparative analysis." *City of Tucson*, 761 F.3d at 1012.

District courts regularly "enter contribution and indemnity bar orders [under California Code of Civil Procedure section 877 and 877.6] in CERCLA cases if the settlement is fair,

United States District Court
Northern District of California

reasonable, and adequate." *Cooper Drum*, 2020 WL 2504331, at *3 (C.D. Cal. May 13, 2020); *see also Heim v. Heim*, No. 5:10-cv-03816-EJD, 2014 WL 1340063, at *4 (N.D. Cal. Apr. 2, 2014) ("Under federal law, particularly in CERCLA cases such as this, district courts have approved settlements and entered bar orders."). "The factors generally considered in determining whether a settlement is in 'good faith' under § 877 and § 877.6 are similar to the facts highlighted by courts in finding a CERCLA settlement to be fair, reasonable, and adequate." *Alisu Invs., Ltd., et al. v. TriMas Corp*, No. CV 16-686-MWF, 2021 WL 3290585, at *3 (C.D. Cal. Apr. 27, 2021) (quoting *Coppola v. Smith*, No. 11-CV-1257 AWI, 2016 WL 8730769, at *3 (E.D. Cal. July 1, 2016)). "Both sets of factors/considerations take into account the amount of the settlement, the settlor's proportionate share of liability, claims and defenses, financial conditions, and the recognition that there is a benefit to settling by saving resources and litigation expenses. Given the similarities, it is difficult to envision a settlement that is in 'good faith' but not fair, reasonable, and adequate, or *vice versa.*" *Id.* (internal citations omitted). Accordingly, courts regularly examine the "good faith" of a CERCLA settlement together with whether the settlement is fair, adequate, and reasonable. *See, e.g.*, *id.*; *Cooper Drum*, 2020 WL 2504331, at *3; *Coppola*, 2016 WL 8730769, at *3-4; *Heim*, 2014 WL1340063, at *5.

## III.   DISCUSSION[8]

Settling Parties argue that the Agreement is a good faith settlement negotiated at arms-

---

[8] Non-Settling Parties filed a separate statement objecting to portions of Paragraph 3 and 7 in the O'Hara Declaration and to statements in Settling Parties' motion. [Docket No. 313-10.] On reply, Settling Parties make their own objections to Non-Settling Parties' evidence and request judicial notice of particular public documents. [Docket No. 316-3.] Non-Settling Parties' statement of objections is procedurally improper because the objections are not contained within the opposition brief. *See* N.D. Cal. Civ. L.R. 7-3(a). The court nevertheless considers them because the combination of Non-Settling Parties' statement of objections and their opposition brief falls within the total page limit. Settling Parties' objections are properly contained in their reply brief.

Non-Settling Parties' particular objections to paragraphs in the O'Hara Declaration are addressed below in the context of the statements' topics. The objections to statements made in the motion are overruled as procedurally improper because argumentation made in a party's briefing is not evidence. As for Settling Parties' objections, the court does not rely on any of the underlying statements. Accordingly, the objections are denied as moot. The court also does not rely on the documents for which Settling Parties request judicial notice, and therefore their request is denied as moot.

United States District Court
Northern District of California

1  length that is proportional to Moyer's overall liability, and that it furthers the purposes of

2  CERCLA.  They argue that the $1.7 million settlement "represents a meaningful discount on

3  Plaintiff's damages" and a compromise on Plaintiff's long-running claims over the contamination

4  problem that it inherited, given that "Moyer operated the site for over thirty years," and that in

5  return, Plaintiff will not stand in the way of approval of the proposed FCMS limited cap-and-

6  monitor remediation plan that the DTSC is currently evaluating.  Mot. at 3-4, 7; Reply at 10.

7  Settling Parties further maintain that the Agreement would effectively end this case, as Plaintiff

8  and Moyer would dismiss their claims against each other, and Moyer would essentially forfeit its

9  own cross-claims against Non-Settling Parties and Additional Parties; as such, the only affected

10 claim by a Non-Settling Party in this lawsuit is Renesas's cross-claim for contribution.  Non-

11 Settling Parties disagree and argue that the Agreement contravenes CERCLA's objectives and

12 fails to satisfy the relevant *Tech-Bilt* factors.

13          After carefully reviewing the record and considering the parties' arguments in their

14 briefing and at the hearing, the court concludes that the Agreement fails to satisfy the good faith

15 standard under *Tech-Bilt* because Settling Parties have not adequately shown that Plaintiff's

16 recovery under the Agreement is reasonably proportional to Moyer's liability, especially in light of

17 the prejudicial impact of the Agreement on the Non-Settling Parties in this case and in the DTSC

18 enforcement action.  *See Grand Terrace*, 192 Cal. App. 3d at 1263 (good faith requirement "was

19 imposed primarily to protect the interests of non-settling defendants."); *PacifiCare*, 198 Cal. App.

20 4th at 1465 (trial court must examine not only the settling tortfeasor's potential liability to the

21 plaintiff, but also the settling tortfeasor's potential liability to all nonsettling tortfeasors).

22          Essentially, the Agreement (1) reimburses Plaintiff for the fees and costs it incurred in this

23 case as well as the DTSC's investigation and enforcement action and the State Court Action, even

24 though none of the settlement fund will go toward the Property's remediation; (2) relieves Moyer

25 of responsibility to contribute  to remediation of the Property through this case, even though it is

26 likely a major source of the contamination; (3) bars Renesas from seeking contribution from

27 Moyer in this case; and (4) effectively forecloses other potentially responsible parties in the DTSC

28 action from seeking contribution from Moyer to cover remediation costs because Moyer will

effectively deplete its assets by satisfying the Agreement here.  In other words, none of the settlement funds will go toward actual remediation, Non-Settling Parties will be left "holding the bag" while Plaintiff recoups most if not all of its costs, and Moyer can wash its hands of the situation.  This outcome contravenes the goals of good faith and equitable cost-sharing at the heart of Sections 877 and 877.6(c).  Separately, the court also finds that the Agreement is not a fair, adequate, and reasonable settlement under CERCLA.  The court first addresses the relevant *Tech-Bilt* analysis and then proceeds to the CERCLA settlement analysis.

### A.    Good Faith Determination under *Tech-Bilt*

For the court to issue a contribution and indemnity bar, the most important *Tech-Bilt* factors to consider are a "rough approximation of [Plaintiff's] total recovery and [Moyer's] proportionate liability" and the "amount paid in settlement." *Tech-Bilt*, 38 Cal. 3d at 499; *see Cooper Drum*, 2020 WL 2504331, at *4.[9]  "[I]t is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages." *Abbott Ford, Inc. v. Super. Ct.*, 43 Cal. 3d 858, 874 (1987).  However, "[t]o ensure that a bar order adequately protects the rights of the non-settling parties, the Court must consider the settlement's potential to prejudice the non-settling parties and determine how it will allocate settlement funds in the action." *Cooper Drum*, 2020 WL 2504331, at *7.  The "[s]ettlor's percentage of liability is the touchstone question to be considered." *Grand Terrace*, 192 Cal. App. 3d at 1262.  "Evaluation of the parties' allocation of settlement proceeds is committed to the sound discretion of the trial court in the good faith settlement approval process." *Erreca's v. Super. Ct.*, 19 Cal. App. 4th 1475, 1489 (1993).  The court may "utilize its own experience, the attorneys' evaluations, and expert opinion in making a decision upon the valuation issue." *Id.*  "If . . . there is no substantial evidence to support a critical assumption as to the nature and extent of a settling defendant's liability, then a determination of good faith based upon such assumption is an abuse of discretion." *Toyota Motor Sales U.S.A., Inc. v. Super. Ct.*, 220 Cal. App. 3d 864, 871 (1990).  Substantial evidence "must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which

---

[9] The other factors are largely irrelevant in this case.

United States District Court
Northern District of California

1    the law requires in a particular case." *Id.*

2        The amount of the settlement, $1.7 million payable to Maxim only, is not in dispute.  *See*

3    Agreement ¶ 1(a); Mot. at 4, Opp'n at 13.  To evaluate the Agreement's proportionality, the court

4    must therefore assess the overall exposure to liability, how much of that exposure is attributable to

5    Moyer versus to the Non-Settling Parties, and how proportional Moyer's settlement amount is to

6    its responsibility for the environmental contamination of the Property.  Neither side adequately

7    addressed with competent evidence the scope of Plaintiff's potential recovery, Defendants' total

8    exposure, or Moyer's and Non-Settling Parties' estimated proportional shares of that exposure.

9    Nor did either side grapple with any of the case law about how to apportion liability in a CERCLA

10   case.[10]  In fact, neither side explained what liability exposure the court should evaluate in this

11   motion.  Is the Agreement seeking to effectively resolve Moyer's potential liability for

12   contamination of the Property, or just Maxim's claims in this case?  The answer is fundamental to

13   the court's analysis, and neither side offered clear and meaningful evidence or argument to support

14   either possible theory of liability.

---

16   [10] "CERCLA does not specifically address how settlements in private party cost recovery actions
     should be apportioned or assessed for equity."  *Heim*, 2014 WL 1340063, at *5.  "A district court
17   may use either the 'proportionate share approach' of § 6 of the Uniform Comparative Fault Act
     ('UCFA') or the "pro tanto approach"[] of § 4 of the Uniform Contribution Among Tortfeasors
18   Act ('UCATA')."  *Cooper Drum*, 2020 WL 2504331, at *7.

> In a pro tanto regime, the amount paid by the settling defendants is
> deducted from the overall verdict, and the non-settling defendants are
> liable for the balance. In the proportionate share approach, the non-
> settling defendant's liability is reduced by the equitable share of the
> settling party's obligation, rather than by what the settling party
> actually paid. The two approaches assign the risk of an inadequate
> partial settlement—one that is lower than the amount the jury
> ultimately allocates to the settling defendant at trial—differently.
> Under the proportionate share approach, the plaintiff bears the risk,
> while under the pro tanto approach, the nonsettling defendants bear
> the risk.

*Schaeffer v. Gregory Vill. Partners, L.P.*, No. 13-CV-04358-JST, 2015 WL 1885634, at *4 (N.D.
Cal. Apr. 24, 2015) (internal quotations and citations omitted).  The Ninth Circuit "generally
favor[s] the UCFA proportionate share approach when construing federal statutes that authorize
contribution but are silent regarding how liability should be allocated to nonsettling defendants."
*AmeriPride*, 782 F.3d at 484-85.  Settling Parties refer to the proportionate share approach without
argument, Mot. at 7-8, and neither side disputes the appropriate method.  In any event, the court
does not reach it in light of its conclusion that the settlement is not in good faith.

1    On the one hand, Settling Parties claim that the Agreement only encompasses liability in

2  this lawsuit.  They contend that approval would effectively wind up this case: Plaintiff's claims

3  against Moyer would be dismissed, Moyer's cross-claims against Non-Settling Parties would be

4  extinguished, and—as the parties conceded at the hearing—the only live claim that would be

5  subject to a bar is Renesas's claim for contribution against Moyer.[11]  Renesas's counsel values that

6  claim at about one-thirtieth of the $1.3 million the Generators spent in the DTSC action, or about

7  $43,000.

8    On the other hand, Settling Parties expressly acknowledge that the justification for the $1.7

9  million settlement fund goes well beyond this case because it represents "reimbursement for

10  damages and costs [Plaintiff] incurred" in the DTSC enforcement action, the State Court Action,

11  and this case, which amounted to a "total expenditure of $1,637,276."  Agreement at 1 (Recitals),

12  ¶ 1(a).  It is uncontested that Moyer's payment is largely intended to allow Plaintiff to recoup

13  costs it expended on litigation, the DTSC's investigation and enforcement action, and Plaintiff's

14  own investigations into the source of the Property's contamination.  Mot. at 3-4, 7; Opp'n at 8.[12]

15  Indeed, the Recitals to the Agreement state that "Maxim has incurred attorneys' fees related to the

16  state court and federal court litigation and administrative processes before the [DTSC] in the

17  amount of $1,418,998, costs of $93,006 and consultant fees of $125,272, for a total expenditure of

18  $1,637,276."  Agreement at 1.[13]  The Agreement also reimburses Plaintiff for other expenses

19  ————————————————

20  [11] As noted above, it is unclear whether Moyer would dismiss its cross-claims upon approval or whether the indemnity bar would apply to those cross-claims.

21  [12] Plaintiff's costs relate to the "significant resources investigating and report[ing] environmental

22  issues at the Property" and submitting reports to the DSTC in 2008 and 2009 and conducting its own investigation of PRP's that it disclosed to the DTSC in 2011.  O'Hara Decl. ¶ 3; Suppl.

23  O'Hara Decl. ¶¶ 3-6.  Settling Parties assert that the Agreement accounts for these costs and is entitled to recover them because "Plaintiff's investigation brought these entities to the attention to

24  DTSC" and "[i]t was Maxim's own investigation that informed DTSC of numerous PRPs and detailed information about those PRPs."  Reply at 12-13.

25  [13] Non-Settling Parties object to Plaintiff's counsel's statement that "Plaintiff expended significant

26  effort to identify potentially responsible parties" and that "Plaintiff also incurred sums investigating the contamination and developing a remediation plan prior to rescission of its

27  purchase of the Property."  O'Hara Decl. ¶ 3; see Docket No. 313-10 at 2-3.  They specifically object to the statements as irrelevant; lacking competency, personal knowledge, and foundation,

28  and/or are vague and ambiguous.  On reply, Settling Parties submit a second declaration from

United States District Court
Northern District of California

1   incurred with respect the Property that are not directly tied to this case, such as the costs to rescind

2   the purchase agreement, its mortgage, and taxes.  Reply at 10.[14]

3   In short, Settling Parties urge that the Agreement will not prejudice Non-Settling Parties

4   because Moyer will forgo its cross-claims against them and wrap up this lawsuit.  Yet in

5   attempting to justify the Agreement, Settling Parties point to Plaintiff's expenses incurred *outside*

6   this case (e.g., in the DTSC investigation and enforcement action, and the State Court Action) that

7   Plaintiff will recoup through the proposed settlement.  More significantly, it is undisputed that

8   none of the $1.7 million settlement funds will be allocated toward remediation of the Property,

9   leaving Non-Settling Parties and other Generators to contend with the yet-to-be-determined full

10   cost of remediation in the DTSC action.  Such a result would prejudice Non-Settling Parties in the

11   DTSC action, even if this case is closed as a result of the proposed settlement.

12   As discussed above, Settling Parties did not explain or analyze the total liability exposure

13   and what it encompasses.  If liability refers to the total damages associated with the Property's

14   contamination, then the cost of remediation is likely to be a large part of the exposure.  No party

15   involved in this motion offered a clear picture of potential remediation costs, with estimates

16   fluctuating between $1.5 million and $20 million.  Nor did anyone discuss Moyer's proportionate

17   share of responsibility for the contamination or remediation.  Thus, according to Non-Settling

18   Parties' expert Anthony Ward, who has been engaged since 2012 as the environmental consultant

19   for the Generators, the FCMS would "require an up-front 30-year present-value financial

20

21   O'Hara that sets forth O'Hara's "own research and investigation, as well as research and

22   investigation conducted under my direction" into environmental contamination at the Property, and clarifies his use of the word "effort."  Suppl. O'Hara Decl. ¶¶ 5-7.  Given that Plaintiff seeks to recover costs related to its investigation and litigation on the Property, statements about its

23   investigative effort are relevant.  Moreover, O'Hara testifies that he led these investigative efforts

24   and therefore has the requisite personal knowledge, laying to rest the objections regarding competency and foundation.  The objections that the statements are vague and ambiguous also

25   lack merit.  Accordingly, the court overrules the objections to paragraph 3 of the O'Hara Declaration.

26   [14] Plaintiff recently applied for a renewal of judgment from the state court related to the rescission

27   of the purchase agreement.  O'Hara Decl. Ex. F.  In the state case, Plaintiff requests $5,547,612.58 inclusive of restitution and damages, plus and interest; to date no part of the money judgment has

28   been satisfied.  *Id.*

assurance capitalization of no less [than] $1.51 million" to cover environmental remediation of the contamination of the Property for over 30 years.  Ward Decl. ¶ 10.  Settling Parties proffer a different 2012 estimate from a consultant named Ron L. Helm that an environmental investigation and minimal remediation would be "in excess of $5 million."  Suppl. O'Hara Decl. ¶ 9; *see* Suppl. O'Hara Decl. Ex. E ¶ 15 (2012 declaration from Helm describing an anticipated DTSC remedial order and stating that "[b]ased on my experience with similar Remedial Actions, I estimate the cost of the above actions, which I consider to be the minimum action necessary to remediate the Property, will be in excess of $5 million.").  At the hearing, the court asked if any party could even estimate the total remediation cost for the Property.  Counsel gave multiple answers ranging from $5 million to up to $20 million.  Ultimately all parties conceded that the amount is unknown given that the DTSC has not issued its decision on the FCMS.

Similarly, the parties offered vague and unsubstantiated conclusions about Moyer's responsibility.  Non-Settling Parties contend that "Moyer alone" is responsible.  Opp'n at 1. Based on counsel's representation, Moyer is paying about half of the total remediation costs before the DTSC.  Neither side points to any actual numbers in the record.   When pressed at the hearing, Plaintiff's counsel also could not estimate Moyer's liability.  Counsel surmised that it could be around $5 million.  The record does not contain any evidence supporting that figure.

If Settling Parties' theory of liability refers to the contamination of the Property outside the confines of this case, the parties did not offer reliable estimates of the total remediation costs.  In addition, no party offered an analysis of Moyer's proportional liability.  Tellingly, Settling Parties did not articulate the effect of this settlement on the DTSC enforcement action, in which Plaintiff, Moyer and Non-Settling and Additional Parties are all respondents.  Absent adequate explanation of the "most important" *Tech-Bilt* factors and supporting evidence, the court cannot endorse a good faith determination.  *See Mattco Forge, Inc. v. Arthur Young & Co.*, 38 Cal. App. 4th 1337, 1350 (1995) (finding abuse of discretion in approving good faith settlement where "defendant did not proffer any evidence regarding their proportionate liability for Mattco's alleged injury . . . [but] merely presented a series of questionable assumptions in their memorandum of points and

United States District Court
Northern District of California

authorities to show the settlement amount was reasonable").[15]

If, on the other hand, exposure for purposes of this motion refers only to Moyer's liability to Plaintiff for the claims in this litigation, Settling Parties do not provide any probable measure of Moyer's proportionate liability *in this case*—as opposed to the total estimated costs of remediation—or connect it to Plaintiff's recovery. They also fail to offer a breakdown of the total $1.7 million settlement amount, allocate any of that amount to expenses Plaintiff incurred in this case as opposed to the DTSC matter, or show how the costs Plaintiff relied on to justify the amount of the settlement are even recoverable. Accordingly, the court cannot make a "rough approximation" of Plaintiff's recovery. *See Cahill v. San Diego Gas & Elec. Co.*, 194 Cal. App. 4th 939, 964 (2011) ("A plaintiff's claims for damages are not determinative in finding a settlement was made in good faith. Rather, the court is called upon to make a 'rough approximation' of what the plaintiff would actually recover" (cleaned up).).

As noted above, none of the settlement funds will be spent on remediating the Property or reimbursing Plaintiff for remediation. Through the settlement, Plaintiff largely seeks to recover its overall investigation and litigation costs it has had to spend regarding the Property before the DTSC, the state court, and this court. On reply, Settling Parties maintain that their CERCLA, RCRA, and implied inequitable claims afford them recovery of these types of expenses. Reply at 12-13. To the contrary, none of these claims support recovery. First, CERCLA "does not provide for the award of private litigants' attorney's fees associated with bringing a cost recovery action." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). "Section 107(a) is limited to recovery of response costs the suing [potentially responsible party] itself directly incurred."

---

[15] Both sides also point to the costs they have already incurred with respect to the property, including litigation, but neither side explains how these costs should figure into the proportionality analysis. Moyer apparently has spent over $500,000 in investigation and research regarding the Property plus $515,000 in settling claims involving a neighboring property. Declaration of Francis M. Goldsberry II ("Goldsberry Decl.") ¶ 4 [Docket No. 316-1.]. Since 2013, Moyer and the Generators have spent about $2.6 million, in addition to mediation costs and attorneys' fees, on remedial investigation of the Property. Ward Decl. ¶ 8. Moyer's share of that cost is unclear, although at the hearing, Renesas's counsel indicated that it was around fifty percent. Meanwhile, Plaintiff does not quantify the amount it has spent conducting its own investigation of the Property's contamination, although the Agreement's Recitals break down the costs, as discussed above. *See generally* Suppl. O'Hara Decl.; Agreement at 1.

United States District Court
Northern District of California

*Chubb*, 710 F.3d at 957.  Indeed, at the hearing, Plaintiff's counsel conceded that he was unable to allocate any of the $1.7 million to costs expended under CERCLA.

RCRA also does not entitle Plaintiff to recovery of these previously incurred costs.  RCRA authorizes a remedy for environmental hazards that "may present an imminent and substantial endangerment to health or the environment." *Ecological Rts. Foundation v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (quoting 42 U.S.C. § 6972(a)(1)(A)-(B)).  In enacting RCRA, "Congress did not intend for a private citizen to be able to undertake a cleanup and then proceed to recover its costs." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 487 (1996).  There is no evidence in the record of any imminent environmental harm at the Property; rather, the lawsuit predominately deals with cleanup of past contamination, and "only CERCLA allows recovery of cleanup costs already incurred." *Pakootas v. Teck Cominco Metals, LTD.*, 830 F.3d 975, 984 n.9 (9th Cir. 2016).

Finally, Settling Parties gesture in conclusory fashion to Plaintiff's implied indemnity claim.  A court "may award attorney's fees to a person who prevails on a claim for implied indemnity" if it finds that three factors are satisfied.  Cal. Civ. Code § 1021.6.  Such an award is discretionary and only upon finding that three factors have been satisfied. [16]  *See id.*; *John Hancock*, 42 Cal. App. 4th at 1536 & n.13 (finding that a fees award under section 1021.6 is not barred by a good faith settlement indemnity bar); *see also Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1043 (N.D. Cal. 2004).  While it is certainly true that Plaintiff may be able to recover fees

---

[16] Civil Code section 1021.6 provides:

> Upon motion, a court after reviewing the evidence in the principal case may award attorney's fees to a person who prevails on a claim for implied indemnity if the court finds (a) that the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by bringing an action against or defending an action by a third person and (b) if that indemnitor was properly notified of the demand to bring the action or provide the defense and did not avail itself of the opportunity to do so, and (c) that the trier of fact determined that the indemnitee was without fault in the principal case which is the basis for the action in indemnity or that the indemnitee had a final judgment entered in his or her favor granting a summary judgment, a nonsuit, or a directed verdict.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   related to its implied equitable indemnity claim, Plaintiff has not established any of the three

2   prerequisites for such an award.  *See* Cal. Civ. § 1021.6(a)-(c).[17]

3         In sum, if liability refers only to exposure in this case, Settling Parties have not provided

4   any valuation of Moyer's liability in this case or connected the settlement funds to any claims.

5   Moreover, whether an evaluation of liability is limited to this case or is broadened to encompass

6   the proceedings before the DTSC, the record evidence provided by the Settling Parties in this

7   motion is insufficient to establish the total exposure and Moyer's proportionate share.  Without

8   such evidence, the court cannot determine whether the "amount of the settlement is within the

9   reasonable range of [Moyer's] proportional share of comparative liability for [Plaintiff's] injuries."

10  *Tech-Bilt*, 38 Cal. 3d at 499.

11        In light of these deficiencies related to the "most important" *Tech Bilt* factors, the court

12  need not reach other considerations.  The court, however, also examines Moyer's "financial

13  conditions and insurance policy limits" because they highlight another aspect of potential

14  prejudice to Non-Settling Parties.  *See Tech-Bilt*, 38 Cal. 3d at 499.

15        All parties agree that Moyer is a dissolved corporation and its only assets available to fund

16  this settlement are through an unidentified insurance policy.  Mot. at 7; Opp'n at 2, 14.  According

17  to Settling Parties, approval of the Agreement would exhaust Moyer's policy limits.[18]  Settling

18  Parties filed two supplemental declarations from Moyer's counsel Francis Goldsberry and an

19  attorney from an unnamed insurer of Moyer, Kenneth H. Sumner, purportedly to clarify this

20

21  [17] For the first time at the hearing, counsel also pointed to the HSAA and other common law
    claims as authorizing a fee recovery.  The court will not consider arguments offered for the first
22  time at oral argument.

23  [18] Originally, Settling Parties relied on a statement from Plaintiff's counsel that "[c]ounsel for
    Moyer's insurer informed me that with the Settlement Agreement, Moyer's policy limits will be
24  exhausted."  O'Hara Decl. ¶ 7.  Non-Settling parties objected to that statement as hearsay,
    speculation, and lacking foundation and competency.  [Docket No. 313-10 at 3.]  This objection is
25  sustained.  Settling Parties are unequivocally relying on this statement for its truth in support of its
    argument that the settlement satisfies the *Tech-Bilt* factor on "financial condition."  Prior to the
26  hearing, the court noted this "incompetent, hearsay evidence," and ordered Settling Parties to
    "submit competent evidence to support their assertion that the settlement will exhaust all of
27  Moyer's insurance funds and there are no other funding sources from which Moyer could fund this
28  settlement."  [Docket No. 318.]

1   assertion.  *See* Declaration of Francis M. Goldsberry II ("Goldsberry Decl. II") [Docket No. 319];

2   Declaration of Kenneth H. Sumner ("Sumner Decl.") [Docket No. 320.]  Goldsberry explained

3   that "[m]y retention as Moyer's defense counsel has specifically excluded all issues related to

4   insurance coverage.  Each of the involved carriers has separate insurance coverage counsel."

5   Goldsberry Decl. II ¶¶ 2-5.  Goldsberry also stated that "Moyer was a California corporation that

6   was dissolved in 1999.  I am not aware of any Moyer assets other than potential insurance

7   coverage."  *Id.* ¶ 6.  Furthermore, "[t]here has been no formal discovery in this action involving

8   the nature and extent of Moyer's insurance coverage."  *Id.* ¶ 7.

9          Sumner attests that he is counsel for "an insurer of Moyer Products, Inc." and has worked

10   on insurance issues relating to Moyer's operations at the Property since at least 2016.  Sumner

11   Decl. ¶¶ 1-2.  Based on his review of Moyer's insurance information, "Moyer's insurance assets

12   are limited" but that "each of the known policies have asserted defenses to coverage for the claims

13   arising from Moyer's operations at the Property."  *Id.* ¶ 3.  Nevertheless, the "policy

14   documentation is limited and actual coverage is disputed based on the defenses raised under the

15   policies."  *Id.* ¶ 4.  Critically, "[a]ny payments made or contemplated on behalf of Moyer were

16   negotiated as a compromise of the defenses to coverage asserted under the policy.  If the

17   contemplated settlement is not finalized, Moyer may have no insurance assets whatsoever based

18   on these defenses."  *Id.*  Also, "[s]ome of the alleged insurance participating in the settlement

19   provides wasting limits.  In other words, any payment of litigation expenses under such policies

20   will reduce the amount of insurance that would otherwise be available for settlement."  *Id.* ¶ 5.

21          At the hearing, Moyer's counsel explained that the scope of his representation does not

22   include the insurance policies.  He could not identify any of Moyer's insurers or the nature of the

23   policies, offer any estimates of policy limits, or explain its insurer's defenses.  Counsel simply

24   acknowledged that Moyer's insurance assets were limited, and that the $1.7 settlement amount

25   would be paid by more than one carrier.  It appears that the $1.7 million amount represents a

26   compromise position taken by Moyer's insurers, which is corroborated by Sumner's testimony.

27   *See* Sumner Decl. ¶ 4.

28          At bottom, this record suggests that approval of the Agreement would make the prospect of

United States District Court
Northern District of California

getting Moyer to contribute money toward remediation in the DTSC enforcement action even more of an uphill battle for Non-Settling Parties even though Moyer is a likely major contributor to the contamination, because the settlement would render Moyer insolvent.  By paying out the $1.7 million settlement amount to Plaintiff, Moyer would exhaust its insurance coverage assets and apparently release its insurers from further coverage obligations.

* * *

In sum, the court concludes that Settling Parties have failed to make a sufficient showing under the critical *Tech-Bilt* factor requiring a rough approximation of Plaintiff's total recovery and Moyer's proportionate share of exposure.  Nor have Settling Parties satisfactorily established that Agreement is fair, reasonable and protects the interests of Non-Settling Parties, or that the Settlement will ensure equitable cost-sharing.  *See Tech-Bilt*, 38 Cal. 3d at 498-500; *Grand Terrace*, 192 Cal. App. 3d at 1263-64.  Based on the evidence in the record, the court finds that the Agreement fails to satisfy the good faith standard under California Code of Civil Procedure sections 877 and 877.6.

**B.      The Adequacy of the Agreement under CERCLA**

The court also concludes that the Agreement is not fair, reasonable, or consistent with the policy objectives of CERCLA.  *See City of Tucson*, 761 F.3d at 1011-12.  Settling Parties assert that one of CERCLA's main goals is to promote settlement, and Plaintiff's investigation helped identify potentially responsible parties for the contamination, facilitated the DTSC's investigation and enforcement action, and ultimately led to the Agreement.  The Supreme Court has recognized that "[t]racking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. . . . [S]uch efforts significantly benefit[] the entire cleanup effort and serve[] a statutory purpose apart from the reallocation of costs."  *Key Tronic*, 511 U.S. at 820. Here, the significance of Plaintiff's investigatory efforts is debatable.  Non-Settling Parties argue that the identities of potentially responsible parties were a matter of public record, and that Moyer was known for decades to be the primary contributor of the contamination.  Non-Settling Parties formulated a list of potentially responsible parties based on public records requests that Renesas's

United States District Court
Northern District of California

1    counsel initiated in 2012 to the DTSC and RWQCB.  Bloom Decl. ¶ 7.  Settling Parties counter

2    that "a large part of DTSC's information was likely the result of earlier efforts of Plaintiff's

3    counsel," and that Plaintiff had actually provided a list to the DTSC in 2011.  Reply at 9; Suppl.

4    O'Hara Decl. ¶¶ 5-6.  The assertion that DTSC relied on Plaintiff's efforts alone is unfounded and

5    conclusory.  Plaintiff's own evidence shows that the DTSC has been aware of hazardous waste on

6    the Property since at least 2003.  O'Hara Decl. ¶ 2.  Absent a more complete record of the DTSC's

7    own investigative efforts on the Property or any input from DTSC officials in this case, the court

8    cannot reach any conclusions about the significance of Plaintiff's efforts to track down other

9    potentially responsible parties.

10           Additionally, the Agreement does not fulfill CERCLA's statutory purpose as it does not

11   advance cleanup of the contaminated Property.  *See San Pedro Boat Works*, 635 F.3d at 447;

12   *Carson Harbor*, 433 F.3d at 1265.  None of the settlement money would actually be spent on

13   remediation.  Instead, the Agreement provides that Plaintiff "will not object to remediation

14   proposals made by Moyer or jointly by Moyer and third parties in connection with the [DTSC]

15   Action."  Agreement ¶ 3.  Plaintiff concedes that Moyer's proposed solution, the FCMS, would

16   adopt a limited "cap and monitor" remediation plan that maintains a "dirty property" as opposed to

17   a more expensive and substantive clean-up plan estimated to cost more than $5 million.  Reply at

18   10; Suppl. O'Hara Decl. ¶ 9.  At the hearing, Moyer's counsel indicated that a cap-and-monitor

19   solution could cost $1.5 to $2 million.  That number is consistent with Non-Settling Parties'

20   expert's estimation that the DTSC's approved remedy will cost $1.51 million at least.  Ward Decl.

21   ¶ 10.  Neither the FCMS nor any substantive explanation of the "cap-and-monitor" plan are in the

22   record.  Nor has the DTSC issued any determination on the final remediation plan.  Absent any

23   supporting evidence, Settling Parties fail to demonstrate how a Maxim's agreement not to object

24   to a limited remediation plan would effectuate CERCLA's purpose to promote "prompt and

25   effective cleanup of waste disposal sites," where Plaintiff openly acknowledges that it is foregoing

26   a more comprehensive, albeit more costly, solution to remediate the Property.  *San Pedro Boat*

27   *Works*, 635 F.3d at 447.  More importantly, not a penny of the settlement amount is allocated

28   toward remediation, even though the settlement fund could theoretically cover the cost of a cap-

and-monitor remediation solution.  Instead, all of the funds go toward reimbursing Plaintiff's fees and costs in this and other litigation.[19]  An Agreement that entails no remediation and instead provides for reimbursement of litigation expenses fails to further CERCLA's policy aims.

## IV.    CONCLUSION

For the foregoing reasons, the court finds that the Agreement does not satisfy the good faith requirements set forth in California Code of Civil Procedure sections 877 and 877.6 and *Tech-Bilt*, 38 Cal. 3d at 494.  The Agreement also is not fair, reasonable and adequate under CERCLA.  Accordingly, the motion for good faith settlement determination is denied.

The parties shall appear for a case management conference on November 30, 2022 at 1:30 p.m. via Zoom Videoconference.  Parties can find the Zoom link to the court's virtual Zoom courtroom at: https://cand.uscourts.gov/judges/ryu-donna-m-dmr/.  A joint case management statement is due by November 23, 2022.

**IT IS SO ORDERED.**

Dated: September 22, 2022



IT IS SO ORDERED.

Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

---

[19] Additionally, as discussed above, Settling Parties have failed to provide any meaningful analysis of its liability against which to evaluate the proportionality of the settlement.  *See City of Tucson*, 761 F.3d at 1012 (vacating approval of CERCLA consent decree as "nowhere in the district court's opinion is there an analysis comparing each party's estimated liability with its settlement amount").