1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   MAXIM L PROPERTIES,                      Case No.  12-cv-00449-DMR

8                  Plaintiff,

9          v.                                **ORDER ON SECOND MOTION FOR
                                             GOOD FAITH SETTLEMENT**
10  MOYER PRODUCTS, INC,                      Re: Dkt. No. 383

11                 Defendant.

12          This matter involves recovery of costs to address environmental contamination at a parcel

13  of real property located at 1300-1310 Old Bayshore Highway in San Jose (the "Property").

14  Plaintiff Maxim I Properties ("Plaintiff") and Defendant and Cross-Claimant Moyer Products, Inc.

15  ("Moyer") (together, "the Settling Parties") brought this joint motion for determination of good

16  faith settlement between Plaintiff, Moyer, and non-party California Environmental Protection

17  Agency Department of Toxic Substances Control ("DTSC").  [Docket Nos. 383 (Mot.); 390

18  (Reply).]  Cross-Defendant/Counterclaimant Renesas Electronics America Inc. ("Renesas") and

19  Cross-Defendants Central Coating Company, Inc.; The Sherwin-Williams Company; Telewave

20  Inc., and Thermionics Laboratory, Inc. (together, "the Non-Settling Parties") all oppose this

21  motion.  [Docket No. 389 (Opp'n).][1]  The court held a hearing on February 27, 2025.  For the

22  following reasons, the motion is granted.

23

24

25  [1] The remaining parties who have not been voluntarily dismissed from this case are cross-
    defendants A.M. Bud Krohn ("Krohn") and National Auto Recovery Bureau, Inc. ("NARB")
26  (collectively "Additional Parties").  Krohn and NARB did not join the Non-Settling Parties' brief
    or appear at the hearing; accordingly, they have waived any opportunity to object to the motion.
27  All parties have consented to the jurisdiction of a magistrate pursuant to 28 U.S.C. §
    636(c).  [Docket Nos. 177, 179.]
28

# I.    BACKGROUND

## A.    Factual Background

The facts of this case are set out in the court's order denying the prior motion for good faith settlement [Docket No. 324 (Prior Order)], and are briefly noted here along with a summary of relevant developments that have occurred since the Prior Order.  The following facts are uncontested unless otherwise noted.

From 1947 to 1982, Moyer operated a pesticide and fertilizer business on the Property. Mot. 9.  In 1977, the California Regional Water Quality Control Board ("RWQCB") inspected the facility and found significant soil and groundwater contamination across the Property due to the presence of hazardous pesticides and solvents.  Prior Order 2.  The Board issued an enforcement order with which Moyer only partially complied.  *Id.*  In 1982, Moyer's stock was sold to new owners who ceased operating the facility.  Mot. 9.  Moyer subsequently went bankrupt and dissolved.  *Id.*

After 1982, ownership of the Property changed hands several times until Plaintiff purchased it in 2002.  Mot. 9.  In 2003, Plaintiff received notice from DTSC and learned that the Property was formerly a transfer site for hazardous waste.  Prior Order 2.  Plaintiff later filed a state court action to rescind the Property sale against the previous owners Enviro-Tech Business and Development, Inc. ("Enviro-Tech") and Kamal Farshi, and Plaintiff was awarded a default judgment of rescission *ab initio* in 2012.  Mot. 9; [Docket Nos. 383-1 (Gregory O'Hara Decl., Oct. 25, 2025) ¶ 5; 383-4 (Judgment of Rescission)].  According to the Settling Parties, the judgment means that as a matter of law, Plaintiff was never the actual owner of the Property, and Enviro-Tech and Farshi remain holders of the title.  Mot. 9-10.  Plaintiff (through its affiliates) leased the Property from Enviro-Tech and Farshi in 2012 and continues to lease the Property and make mortgage payments and property tax payments since then.  *Id.*  Enviro-Tech is now dissolved and Farshi is deceased.  *Id.* at 10.

In 2012, the DTSC initiated an Enforcement Order for Corrective Action related to hazardous contamination at the Property against 60 respondents, including 54 of those who had generated hazardous waste that was transported to the Property, called "Generators."  Mot. 10;

O'Hara Decl. ¶ 2; [Docket No. 383-3 (Enforcement Order)].  All current parties in this case except Renesas were respondents to the Enforcement Order.  According to the Settling Parties, Plaintiff conducted an investigation which assisted DTSC in identifying the responsible Generators.  Mot. 10.  In early 2013, DTSC entered into a Corrective Action Consent Agreement with a group of at least 40 Generators, including Moyer, Renesas, and the other Non-Settling Parties (except Central Coating Company, Inc.).  O'Hara Decl. ¶ 10; [Docket No. 383-5 (Consent Agreement)].  Pursuant to the Consent Agreement, the Generators investigated the Property and developed a study of possible approaches to remediate the contamination called the Corrective Measures Study ("CMS").  Mot. 11.  Moyer contributed approximately $1.5 million of the $3 million cost for preparation of the CMS, with the other Generators collectively contributing the other half.  *Id.*  DTSC submitted the CMS for public comment in February 2023.  O'Hara Decl. ¶¶ 11-12; [Docket Nos. 383-6 (CMS); 383-7 (Approval Letter)].  No objections were filed.  Approval Letter.  DTSC approved the CMS in March 2023.  *Id.*  Based on the approved CMS, estimates for the total cost of remediation range from $1,320,000 to $2,400,000 and it is projected to take 30 years to complete.  Mot. at 11-12.  The next step is for DTSC and responsible parties to develop a corrective measures implementation plan (CMIP), which DTSC requested on July 9, 2024.  *Id.*  At the February 27, 2025 hearing, the parties had no further updates regarding the CMIP or any updated cost estimates.

### B.    Procedural History

In 2012, Plaintiff filed a complaint for contribution, injunctive relief, and damages against Moyer and other entities associated with hazardous waste on the Property alleging violations of the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Resource Conservation and Recovery Act ("RCRA"), the California Hazardous Substance Account Act ("HSAA"), and other state law claims.  [Docket No. 1 (Compl.).]  Plaintiff subsequently dismissed its claims against all defendants except Moyer.  Prior Order 4-5.  Moyer filed counterclaims against Plaintiff, cross-claimed against the other defendants for contribution under CERCLA, HSAA, and California Health and Safety Code section 25325.5(a), and also filed cross-claims against the Additional Parties (Krohn and NARB) for indemnity.  *Id.*  Moyer

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   subsequently dismissed its cross-claims against all but the Non-Settling Parties and the Additional

2   Parties.  Mot. 13.  Renesas also filed counterclaims against Plaintiff and Moyer for contribution

3   under CERCLA.  *Id.*  Renesas dismissed its counterclaim against Plaintiff, but its counterclaim

4   against Moyer is still pending.  *Id.*[2]

5           On February 21, 2013, the Honorable Paul S. Grewal, who was then presiding over this

6   case, stayed the lawsuit after the parties represented that litigation could not proceed while

7   DTSC's evaluation of the CMS was pending and until DTSC had approved a remediation plan.

8   [Docket No. 194.]  In June 6, 2016, the suit was transferred to the undersigned.  [Docket No. 231.]

9   The parties submitted periodic status reports during the pendency of the stay.

10          In December 2021, Plaintiff and Moyer reached a conditional settlement agreement and

11  moved for the court's approval upon determination of good faith.  [Docket No. 282.]  Under that

12  proposed settlement, Moyer agreed to pay Plaintiff a total of $1,700,000.  In exchange, Plaintiff

13  agreed not to object to remediation proposals made by Moyer (individually or jointly) in

14  connection with the DTSC action, and the parties agreed to dismiss all claims against one another.

15  *Id.*  In September 2022, the court denied approval of the settlement, finding that it did not satisfy

16  the good faith requirements under California Code of Civil Procedure sections 877 and 877.6, and

17  that it was not fair, reasonable and adequate under CERCLA.  Prior Order 25.

18          **C.    Settlement Agreement and the Pending Motion**

19          In the parties' October 9, 2024 joint case management conference statement, Plaintiff and

20  Moyer (the Settling Parties) reported they had reached a second bilateral settlement and had fully

21  executed a settlement agreement and release memorializing the same.  [Docket No. 376.]  On

22  October 15, 2024, the Settling Parties filed an updated statement reporting that they had reached a

23  third settlement agreement that included DTSC ("Agreement") which superseded the bilateral

24  settlement agreement; they filed the Agreement with the court.  [Docket No. 377.]

25          The Settling Parties now move for a determination of good faith settlement for the

26

27  ───────────────

28  [2] Renesas has previously represented that its counterclaim against Moyer is valued at around
    $43,000, or one-thirtieth of the amount spent by Generators under the Consent Agreement.  Prior
    Order 16; *see also* Opp'n 5 n.2.

Agreement. O'Hara Decl. ¶ 2; [Docket No. 383-2 (Agmt.)]. The relevant terms of the Agreement are summarized as follows:

1. Moyer agrees to pay, through its insurers, a total of $1,700,000 into a qualified settlement fund ("QSF"). Plaintiff shall work with DTSC to establish the QSF to finance the implementation of corrective action at the Property at the direction and discretion of DTSC. Within thirty days of the final ruling on motion for good faith settlement, the Moyer payment shall be delivered to the QSF. Agmt. ¶ 1(a)-(b).

   a. DTSC will implement the corrective action at the Property either directly or through a respondent(s) of DTSC's election, but not Moyer or Plaintiff (including Plaintiff's affiliates). *Id.* ¶ 1(a).

   b. Under the terms of the Agreement, Plaintiff may apply to DTSC for reimbursement of recoverable costs from the QSF up to $380,000. *Id.* ¶ 1(a). DTSC has sole discretion to make a final determination of the amount of recoverable costs. *Id.* Plaintiff submitted a sworn declaration agreeing not to seek more than $160,000 in recoverable costs from the QSF. [Docket No. 390-1 (Gregory O'Hara Decl., Feb. 3, 2025 (Supp. O'Hara Decl.) ¶ 5.]

2. Plaintiff and its affiliates, Moyer, and DTSC agree to dismiss all claims, crossclaims, and counterclaims against one another and release all past, present, and future claims relating to the contamination at the Property. *Id.* ¶¶ 2-4.

   a. This includes a covenant by DTSC not to sue or take any judicial or administrative action against Moyer, Plaintiff, or Plaintiff's affiliates for claims related to the current contamination at the Property. *Id.* ¶ 4.

   b. DTSC expressly reserves all rights and claims against Plaintiff and Moyer with respect to certain other claims such as the introduction of hazardous substances to the Property after the effective date of the Agreement, or based on claims under Cal. Civ. Code § 1542. *Id.* ¶¶ 5-6, 10. Plaintiff and Moyer waive their rights under Cal. Civ. Code § 1542. *Id.* ¶ 10.

3. The Agreement was subject to a thirty day public comment period. *Id.* ¶ 7. If no

United States District Court
Northern District of California

comments were received, Plaintiff, Moyer, and DTSC agreed to jointly move the court for a good faith settlement determination. *Id.* DTSC published an announcement about the Agreement in the San Jose Mercury News and announced the opening of a public comment period on the proposed settlement from October 30, 2024 to December 3, 2024. [Docket No. 390-3 (Gavin McCreary Decl., Jan. 31, 2025) ¶ 4.] No comments or objections to the proposed settlement were registered by the public. *Id.*[3] Effectuation of the Agreement is contingent on the court's approval of the motion for good faith settlement. *Id.* ¶ 9.

At the February 27, 2025 hearing, the parties confirmed that the settlement, if approved, would bar all outstanding claims in this case. Specifically, it would bar Moyer's cross-claims against the remaining parties as well as Renesas's cross-claims against Moyer. *See* Mot. 13.

## II.    LEGAL STANDARDS

### A.    Good Faith Determination of Settlement

A settling party in a federal action involving California claims may move for a good faith determination of settlement under California Code of Civil Procedure sections 877 and 877.6, which govern settlements among joint tortfeasors. *Fed. Savings & Loan Ins. Corp. v. Butler*, 904 F.2d 505, 511 (9th Cir. 1990). A good faith settlement of claims against "one or more of a number of tortfeasors claimed to be liable for the same tort" will not "discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others." Cal. Code Civ. Proc. § 877(a). It will also effectively "discharge the party to whom it is given from all liability for any contribution to any other parties." *Id.* § 877(b). If the court determines the settlement is made in good faith, its order "bars any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.'" *Id.* § 877.6(c); *John Hancock Mut. Life Ins. Co. v. Setser*, 42 Cal. App. 4th 1524, 1529 (1996). Sections 877 and 877.6(c) are aimed at two objectives: "equitable sharing of costs among the

---

[3] None of the Non-Settling Parties or Additional Parties registered an objection to the proposed settlement during the public comment period.

United States District Court
Northern District of California

parties at fault, and . . . encouragement of settlements." *Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 38 Cal. 3d 488, 494 (1985). "The good faith provision of section 877 mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives." *Id.*; *see also Butler*, 904 F.2d at 511 ("The obvious purpose of this statute is to determine at an early state what effect, if any, a settlement has on the setoff against other defendants and on contribution rights.").

The good faith requirement, "which a settling defendant must satisfy to invoke the statutory bar against indemnity claims, was imposed primarily to protect the interests of non-settling defendants." *City of Grand Terrace v. Super. Ct.*, 192 Cal. App. 3d 1251, 1263 (1987). "When evaluating whether the parties reached a settlement in good faith, a trial court must examine not only the settling tortfeasor's potential liability to the plaintiff, but also the settling tortfeasor's potential liability to all nonsettling tortfeasors." *PacifiCare of Cal. v. Bright Med. Assocs., Inc.*, 198 Cal. App. 4th 1451, 1465 (2011).

Any party is entitled to a hearing on the issue of a good faith settlement; however, a settling party may proactively file a motion for good faith determination of the settlement. Cal. Civ. Proc. Code § 877.6(a). The application must "indicate the settling parties, and the basis, terms, and amount of the settlement." *Id.* § 877.6(a)(2).

In conducting the good faith inquiry, the court must assess "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." *Tech-Bilt*, 38 Cal. 3d at 499. A good faith settlement is one in which "defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be." *Id.* "To determine whether a settlement has been made in good faith, California courts consider (1) 'a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability'; (2) 'the amount paid in settlement'; (3) 'the allocation of settlement proceeds among plaintiffs'; and (4) 'a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial.'" *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1064 (9th Cir. 2011) (quoting *Tech-Bilt*, 38 Cal. 3d at 499) (the "*Tech-*

7

*Bilt* factors"). "The first two factors are the most important." *Cooper Drum Cooperating Parties Grp. v. Am. Polymers Corp.*, No. CV-19-03007, 2020 WL 2504331, at *4 (C.D. Cal. May 13, 2020). "The California Supreme Court also held that '[o]ther relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants.'" *Mason & Dixon*, 632 F.3d at 1064 (quoting *Tech-Bilt*, 38 Cal. 3d at 499). "[W]hen the good faith nature of a settlement is disputed, it is incumbent upon the trial court to consider and weigh the *Tech-Bilt* factors." *Grand Terrace*, 192 Cal. App. 3d at 1261.

A party opposing a motion for good faith settlement carries the burden to establish a lack of good faith and "must demonstrate . . . that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." *Tech-Bilt*, 38 Cal. 3d at 499-500; *see* Cal. Civ. Proc. Code § 877.6(d). "If contested, declarations by the non-settlor should be filed which in many cases could require the moving party to file responsive counterdeclarations to negate the lack of good faith asserted by the non-settling contesting party." *Grand Terrace*, 192 Cal. App. 3d at 1262; *see* Cal. Civ. Proc. Code § 877.6(b). "A good faith determination under Cal. Code Civ. Proc. § 877.6 is both fact-sensitive and discretionary." *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1504 (9th Cir. 1994); *see also Whitehurst v. Heinl*, No. 09-CV-04808-MEJ, 2015 WL 1738385, at *3 (N.D. Cal. Apr. 14, 2015) ("The determination as to whether a settlement is made in good faith is a matter within the court's discretion").

## B.    CERCLA Settlement

"Congress enacted CERCLA in 1980 . . . 'in response to the serious environmental and health risks posed by industrial pollution.'" *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)).   In enacting the law, Congress intended "to provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *Carson Harbor Vill. v. Cty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).  Congress also intended to "ensure that

United States District Court
Northern District of California

1    polluters were held responsible for the cleanup efforts, and encourage settlement through specified

2    contribution protection." *Chubb*, 710 F.3d at 956.  The Ninth Circuit "construes CERCLA

3    liberally to effectuate the statute's two primary goals: '(1) to ensure the prompt and effective

4    cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances

5    bear the cost of remedying the conditions they created.'" *City of Los Angeles v. San Pedro Boat*

6    *Works*, 635 F.3d 440, 447 (9th Cir. 2011).

7         CERCLA section 107 "allows private parties who incur cleanup costs to recover those

8    costs from 'various types of persons who contributed to the dumping of hazardous waste at a

9    site.'" *Carson Harbor*, 433 F.3d at 1265 (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d

10   1149, 1152 (9th Cir. 1989)); *see* 42 U.S.C. § 9607.  So-called "potentially responsible parties"

11   may be held strictly liable "for the cleanup of environmental hazards, irrespective of whether they

12   directly contributed to the contamination." *Chubb*, 710 F.3d at 961.  "CERCLA also authorizes a

13   responsible party who has incurred liability under § 9607(a) to bring an action for contribution

14   under § 9613(f)(1) against any other potentially responsible party." *AmeriPride Servs. Inc. v.*

15   *Texas E. Overseas Inc.*, 782 F.3d 474, 480 (9th Cir. 2015).  "'Contribution" is not defined in

16   CERCLA, but is interpreted to mean 'the tortfeasor's right to collect from others responsible for

17   the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being

18   determined as a percentage of fault.'" *Id.* (quoting *United States v. Atl. Rsch. Corp.*, 551 U.S. 128,

19   138 (2007)).  "In resolving contribution claims, the court may allocate response costs among liable

20   parties using such equitable factors as the court determines are appropriate." *Id.* (quoting 42

21   U.S.C. § 9613(f)(1)). "CERCLA does not limit the equitable factors a court may consider." *Id.*

22        "[O]ne of the core purposes of CERCLA is to foster settlement through its system of

23   incentives and without unnecessarily further complicating already complicated litigation."

24   *Chubb*, 710 F.3d at 971 (quoting *Cal. Dep't of Toxic Substances Control v. City of Chico*, 297 F.

25   Supp. 2d 1227 (E.D. Cal. 2004)); *see United States v. Montrose Chem. Corp.*, 50 F.3d 741, 746

26   (9th Cir. 1995) (referring to "CERCLA's policy of encouraging early settlements").  Consistent

27   with this purpose, "a party who has resolved its CERCLA liability through a judicially approved

28   consent decree 'shall not be liable [to other responsible parties] for claims for contribution

9

1    regarding matters addressed in the settlement.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011

2    (9th Cir. 2014) (quoting 42 U.S.C. § 9613(f)(2) (alterations in original).  To approve a CERCLA

3    settlement, "a district court must conclude that the agreement is procedurally and substantively

4    'fair, reasonable, and consistent with CERCLA's objectives.'"  *Id.* at 1011-12 (quoting

5    *Montrose*, 50 F.3d at 748); *see San Diego Unified Port Dist. v. Gen. Dynamics Corp.*, No. 07-CV-

6    01955-BAS-WVG, 2017 WL 2655285, at *6 (S.D. Cal. June 20, 2017) (applying the same

7    standards to CERCLA settlements involving private parties).  The court "must find that the

8    agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative

9    fault, apportioning liability among the settling parties according to rational (if necessarily

10   imprecise) estimates of how much harm each [potentially responsible party] has done.'"  *City of*

11   *Tucson*, 761 F.3d at 1012 (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st

12   Cir. 1996)) (alterations in original).  In so finding, the court must "independently 'scrutinize' the

13   terms of a settlement," "determine the proportional relationship between the [settlement amount]

14   to be paid by the settling defendants and the [plaintiff's] current estimate of total potential

15   damages" and assess "the fairness of that proportional relationship in light of the degree of

16   liability attributable to the settling defendants."  *Montrose*, 50 F.3d at 747.  "A district court

17   abuses its discretion where it does not fulfill its obligation to engage in this comparative analysis."

18   *City of Tucson*, 761 F.3d at 1012.

19          District courts regularly "enter contribution and indemnity bar orders [under California

20   Code of Civil Procedure section 877 and 877.6] in CERCLA cases if the settlement is fair,

21   reasonable, and adequate."  *Cooper Drum*, 2020 WL 2504331, at *3 (C.D. Cal. May 13, 2020);

22   *see also Heim v. Heim*, No. 5:10-cv-03816-EJD, 2014 WL 1340063, at *4 (N.D. Cal. Apr. 2,

23   2014) ("Under federal law, particularly in CERCLA cases such as this, district courts have

24   approved settlements and entered bar orders.").  "The factors generally considered in determining

25   whether a settlement is in 'good faith' under § 877 and § 877.6 are similar to the facts highlighted

26   by courts in finding a CERCLA settlement to be fair, reasonable, and adequate."  *Alisu Invs., Ltd.,*

27   *et al. v. TriMas Corp*, No. CV 16-686-MWF, 2021 WL 3290585, at *3 (C.D. Cal. Apr. 27, 2021)

28   (quoting *Coppola v. Smith*, No. 11-CV-1257 AWI, 2016 WL 8730769, at *3 (E.D. Cal. July 1,

1    2016)). "Both sets of factors/considerations take into account the amount of the settlement, the

2    settlor's proportionate share of liability, claims and defenses, financial conditions, and the

3    recognition that there is a benefit to settling by saving resources and litigation expenses. Given

4    the similarities, it is difficult to envision a settlement that is in 'good faith' but not fair, reasonable,

5    and adequate, or *vice versa.*" *Id.* (internal citations omitted). Accordingly, courts regularly

6    examine the "good faith" of a CERCLA settlement together with whether the settlement is fair,

7    adequate, and reasonable. *See, e.g.*, *id.*; *Cooper Drum*, 2020 WL 2504331, at *3; *Coppola*, 2016

8    WL 8730769, at *3-4; *Heim*, 2014 WL1340063, at *5.

9    **III.    DISCUSSION**

10           The Settling Parties argue that the Agreement addresses the concerns raised by the court in

11   its Prior Order and that it satisfies the *Tech-Bilt* factors, is in good faith, and is consistent with

12   CERCLA's objectives. Mot. 18-19. For the reasons stated below, the court agrees.

13           **A.    Application of *Tech-Bilt* Factors**

14           The Non-Settling Parties argue that the Agreement is not in good faith because it lacks

15   proportionality and because there was evidence of collusion aimed at prejudicing the Non-Settling

16   Parties. Opp'n 9-13.

17           Proportionality at the settlement stage is a "rough approximation," not an exact science.

18   *Tech-Bilt*, 38 Cal. 3d at 499. As the parties opposing the motion, the Non-Settling Parties carry

19   the burden to establish that the settlement is "grossly disproportionate to what a reasonable person,

20   at the time of the settlement, would estimate the settling defendant's liability to be." *Id.* (citing

21   *Torres* v. *Union Pacific R.R. Co*., 157 Cal. App. 3d 499, 509 (1984)).

22           The Agreement cures many of the defects noted by the court in its Prior Order. Most

23   notably, all settlement funds will go toward remediation of the Property, although Plaintiff may

24   seek reimbursement up to $160,000 for costs related to corrective action at the site. It is now clear

25   what liability exposure is being resolved by this settlement, as well as how the settlement will

26   affect the DTSC action. The Agreement provides for the release of all liability that the Settling

27   Parties owe to each other arising from the Property contamination, and will prevent DTSC from

28   bringing regulatory actions against the Settling Parties arising from historical contamination at the

United States District Court
Northern District of California

Property.  Essentially, Plaintiff will set up a QSF, Moyer will fund the QSF with the full amount of the settlement, and then both parties' responsibilities will conclude.  DTSC will manage the QSF and implementation of remedial action.  The Non-Settling Parties complain that this goes beyond the scope of this case, as it involves a non-party (DTSC) and releases potential claims by DTSC that are not before this court.  Opp'n 15-16.[4]  Sections 877 and 877.6 and *Tech-Bilt* do not require that the parties to a good faith settlement be limited only to the parties in the operative complaint.  Here, it does not suggest bad faith to involve DTSC in the settlement agreement because, as acknowledged long ago by all parties, DTSC's regulatory action has been fundamental to the scope of the parties' liability to each other with respect to historical contamination at the Property.  In fact, the court stayed the case in 2013 at the parties' joint request "pending approval of a corrective remedy by DTSC," noting that counsel "represented to the Court that this action cannot be adjudicated or settled until such time as the nature and extent of the contamination to the property that is the subject of this action has been determined to the satisfaction of [DTSC] and DTSC has approved the choice of corrective measures."  [Docket No. 194 (Order Staying Case).]  Damages in this case primarily arise from contribution and indemnity between private parties to implement DTSC-enforced remedial activities.  [Docket No. 1 (Compl.).]  The settlement funds are going into a fund administered by DTSC so that DTSC can implement those remedial activities at the Property.  In this context, the release from DTSC is certainly not so "out of the ballpark" that it is inconsistent with the equitable objectives of sections 877 and 877.6.  *See Tech-Bilt*, 38 Cal. 3d at 499-500.

The court now turns to the *Tech-Bilt* factors.  The first two factors, which are the "most important," involve the amount paid in settlement in proportion to the approximate liability of the settlers.  *Cooper Drum Cooperating Parties Grp*., 2020 WL 2504331, at *4.  DTSC has now approved the CMS, and the Settling Parties provided two estimates of the remediation cost which

---

[4] The Non-Settling Parties cite *Marshall v. Northrop Grumman Corp.,* 469 F. Supp. 3d 942, 949 (C.D. Cal. 2020) for the proposition that a release of claims cannot "go beyond the scope of the allegations in the operative complaint."  *Marshall* is way off-point.  It examines a broad release in the context of judicial approval of a Rule 23 class action settlement, which raises due process concerns about extinguishing claims belonging to absent class members that go beyond the allegations in the case.  Such concerns are not present here.

United States District Court
Northern District of California

1    are within relatively close range of each other ($1.32 million and $2.4 million).  At the hearing,

2    the Settling Parties explained that the $1.32 million estimate is based on the CMS, and the $2.4

3    million is an estimate provided by DTSC which includes additional remedial activities on top of

4    the CMS.  The estimates allow the court to roughly determine what the total liability may be in

5    this case.  The Non-Settling Parties argue that the cost estimates cannot be relied upon because

6    DTSC has begun to "verbally back[] away from" the approved CMS and to require additional

7    remedial activities.  [Docket No. 389-1 (Anthony Ward Decl., Jan. 23, 2025) ¶¶ 5-8.]  However,

8    DTSC has not rescinded its prior approval or stated that it plans to, and the Non-Settling Parties

9    provide no evidence that costs are expected to be drastically different from the given estimates.

10   Their argument that DTSC could reject its prior approval and require a new remediation plan is

11   speculative.  It is reasonable to rely on the estimates currently in the record to evaluate the total

12   liability in this case.

13        Moyer agrees to pay $1.7 million toward the settlement.  Assuming that Plaintiff obtains

14   reimbursement for the maximum amount it has agreed to seek ($160,000), and the remediation

15   cost is at the high end ($2.4 million), $1.54 million will go toward remediation.  This represents

16   64% of the total remediation costs.  Moyer already contributed $1.5 million to the cost of

17   developing the CMS (approximately 50% of the total), with the Generators collectively paying for

18   the remaining 50%.  The Non-Settling Parties argue that Moyer is solely responsible for the

19   entirety of the contamination at the Property, apparently suggesting that a fair settlement would

20   constitute 100% of the costs of investigation and remediation.  Opp'n 6-7.  The record does not

21   support this view.  Although there is evidence suggesting Moyer may have caused the majority of

22   the contamination at the Property, [Docket No. 313-5 (Anthony Ward Decl., March 31, 2022) ¶ 6],

23   there is also evidence of contributory fault by the other dozens of Generators in the 2013 Consent

24   Agreement.  *See* Consent Agreement 6-9.  The court must also recognize that "a settlor should pay

25   less in settlement than he would if he were found liable after trial."  *Tech-Bilt*, 38 Cal. 3d at 489.

26   In light of the existing disputes of fact, it is not "out of the ballpark" that Moyer's contributions

27   should be 50% of the cost of the CMS and 64% of the total remediation costs.  *See id.* at 499-500.

28        As for Plaintiff, its contribution to the settlement is solely administrative: Plaintiff will

United States District Court
Northern District of California

13

United States District Court
Northern District of California

"work with DTSC to establish a QSF to finance the implementation of corrective action."  Agmt. ¶ 1(a).  Pursuant to the Agreement, Plaintiff must do so within thirty days of the final ruling on the good faith settlement.  *Id.* ¶ 1(b).  Plaintiff also has an option to recover up to $160,000 in "recoverable costs," which must be supported by documentation and must have been incurred "related to corrective action at the Property."  *Id.* ¶ 1(a); Supp. O'Hara Decl. ¶ 5.  The determination of Plaintiff's recoverable costs "shall be made by DTSC in its sole discretion and there shall be no right of appeal or contest by" Plaintiff.  *Id.*  The Non-Settling Parties argue the Agreement is "illusory" because Plaintiff does not provide any consideration in exchange for the release of claims against it, other than acting as a "passive middleman" in the transfer of Moyer's funds to the QSF.  Opp'n 2-3.  Plaintiff counters that it is relinquishing "all claims for its common law damages and legal costs," as well as its ability to "appeal any decision by DTSC as to recoverable costs."  Reply 9.

Plaintiff asserts it has sustained millions of dollars in damages in legal fees, nuisance, trespass and negligence, diminution of property value, emotional distress, and mortgage and tax payments, but does not explain how these damages could be legally recovered from Moyer or DTSC.  Mot. 19-20.  The court's Prior Order explains in depth that Plaintiff's CERCLA and RCRA claims against Moyer do not support any recovery for attorney's fees.  Prior Order 19-21.  The Prior Order did not address Plaintiff's HSAA claim, but case law indicates that attorney's fees are also not recoverable under that statute.  *See California Dep't of Toxic Substances Control v. Jim Dobbas, Inc.,* No. 2:14-595 WBS EFB, 2014 WL 4627248, at *7 (E.D. Cal. Sept. 16, 2014).  The Prior Order left open the possibility that Plaintiff could recover under an implied equitable indemnity claim, but Plaintiff has not fleshed that out. *See* Cal. Civ. Code § 1021.6; Prior Order 20.  Plaintiff will be able to recover costs for investigating the site, but only up to self-imposed cap within a cap.[5]

---

[5] At the hearing, Plaintiff clarified that "recoverable costs" under the Agreement refer to costs Plaintiff may recover under CERCLA, RCRA, and HSAA.  *See* Agmt. ¶ 1(a).  Plaintiff explained that it believes it is entitled to up to $380,000, but due to a lack of historical records, its strongest claim is for $160,000.  This includes $152,000 paid to an environment consultant to prepare an investigative report about the Property, which DTSC had required from Plaintiff in 2009.

1   The Non-Settling Parties' argument that the Agreement simply allows Plaintiff to walk

2   away from further litigation or regulatory action regarding the Property ignores a central fact.  The

3   vast bulk of the settlement funds generated by this case—a case initiated by Plaintiff—will not

4   land in Plaintiff's pocket.[6]  Instead, the funds will be used for a purpose central to this dispute:

5   remediation of the Property.  The primary benefit of the settlement to Plaintiff is the end of years-

6   long costly litigation before the court as well as DTSC involving the Property.  When viewed

7   holistically and in context, contrary to the Non-Settling Parties, the Agreement is far from illusory.

8   Next, the Non-Settling Parties object that Plaintiff's affiliates are folded into the settlement

9   release, despite being potentially liable under CERCLA and HSAA.  *See* Agmt. § 3.  The Non-

10  Settling Parties do not dispute that, by virtue of the judgment for rescission, Plaintiff was never an

11  "owner" of the Property and therefore may not be liable under CERCLA or the HSAA.  Opp'n 7.

12  However, the Non-Settling Parties argue that Plaintiff's affiliate American Drilling may be liable

13  under CERCLA and HSAA because it currently leases and operates on the Property.  *Id.*  Plaintiff

14  disputes that American Drilling has potential liability, arguing that American Drilling never

15  "caused or contributed to the environmental contamination at the site."  Reply 8, 11-12.

16  "An operator need not itself have caused contamination or pollution to be liable; there is no

17  exception to liability for 'innocent' operators."  *Orange Cnty. Water Dist. v. Sabic Innovative*

18  *Plastics US, LLC*, 14 Cal. App. 5th 343, 376 (2017), *as modified on denial of reh'g* (Aug. 25,

19  2017).  The Supreme Court has broadly defined "operator" under CERCLA: "an operator must

20  manage, direct, or conduct operations specifically related to pollution, that is, operations having to

21  do with the leakage or disposal of hazardous waste, or decisions about compliance with

22  environmental regulations."  *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998).  The HSAA

23  adopts CERCLA's standards for determining liability.  *Orange Cnty. Water Dist.*, 14 Cal. App.

24  5th at 371.  American Drilling indisputably operates on the Property under CERCLA and HSAA.

25  Therefore, it may have some potential liability.  But Plaintiff correctly points out that no claims

26

27  _____

28  [6] In the Prior Order, the court denied the motion for good faith settlement because all of the funds would go to Plaintiff to reimburse fees and costs spent on years of litigation and regulatory action, and none of the funds would be spent on remediation.

*United States District Court*
*Northern District of California*

have ever been asserted against American Drilling, nor is it a party to the 2013 Consent

Agreement.  The Non-Settling Parties do not explain what share of liability, if any, American

Drilling might have as compared to Moyer and the Generators.  They fail to point to any evidence

that American Drilling contributed to the contamination at the Property or acted without due care.

As such, even if American Drilling theoretically might have some potential liability, its liability in

proportion to the other responsible parties appears to be very low or non-existent.  *See TDY*

*Holdings, LLC v. United States*, 885 F.3d 1142, 1147 (9th Cir. 2018) (finding that district court

had discretion to apportion fault between CERCLA respondents based on "the degree of the

parties' involvement in the generation or disposal of hazardous waste and the degree of care that

the parties took with respect to the waste").

    After careful consideration, the court finds that the settlement is not illusory nor is it

grossly disproportionate.  Plaintiff and its affiliates are giving up their right to bring suit for

activities related to the current contamination at the Property, as well as Plaintiff's right to appeal

the determination of the recoverable costs.  Plaintiff will not be receiving the bulk of the

settlement funds.  The release of Plaintiff and its affiliates is appropriate because the parties seem

to agree that Plaintiff is likely not liable itself, and no evidence suggests American Drilling has

contributed to contamination at the Property.  The court finds that the settlement is "within the

reasonable range of the settling [party's] proportional share of comparative liability."  *See Tech-*

*Bilt*, 38 Cal. 3d at 499.

    For similar reasons, the court finds that the Agreement satisfies the third *Tech-Bilt* factor,

which looks at the allocation of settlement proceeds.  *See Tech-Bilt*, 38 Cal. 3d at 489.  Plaintiff

preserves the option to apply for $160,000 in "recoverable costs," subject to DTSC approval.  This

constitutes 9% of the total settlement amount.  As Plaintiff clarified at the hearing, it would only

recover costs it is entitled to seek under CERCLA, RCRA, and HSAA.  The remaining 91% of the

settlement fund will benefit the other responsible parties by funding the remediation costs, thereby

lessening or eliminating what they would otherwise have to contribute.  Plaintiff's recovery is

equitable.

    The court now turns to the other relevant *Tech-Bilt* factors, which are the financial

United States District Court
Northern District of California

conditions of the settling parties and the existence of collusion. *Tech-Bilt*, 38 Cal. 3d at 489. It is undisputed that Moyer is a dissolved corporation with no assets and no individual representative, and it has been represented solely through legal counsel appointed by Moyer's insurance carriers. Reply 14; [Docket No. 390-2 (Theresa Barfield Decl., Feb. 3, 2025) ¶ 2-3]. As the court previously found, the $1.7 million settlement appears to represent a compromise position taken by Moyer's insurers, and payment would likely exhaust Moyer's insurance coverage assets and release its insurers from further coverage obligations. Prior Order 21-23. The Non-Settling Parties take issue with the fact that Moyer has never provided an accounting of its insurance coverage. Opp'n 10, 17. Where, as in this case, the court determines that the settlement is roughly proportional and there is no evidence that Moyer is hiding assets, an exact accounting of the available insurance coverage is unnecessary. *See, e.g., Pac. Res. Assocs. LLC v. Suzy Cleaners,* No. 3:20-CV-00234-RBM-DEB, 2023 WL 7926795, at *9 (S.D. Cal. Nov. 16, 2023) ("While the Court agrees that [settler's financial] declaration is rather vague, this does not overshadow the Court's analysis above regarding [settler's] proportionate share of liability. Further discovery regarding [settler's] financial condition is not necessary.").

The Non-Settling Parties next argue that Plaintiff, Moyer, and DTSC "appear to have colluded" to unduly prejudice them. Opp'n 11. They contend that the Settling Parties went behind their backs to involve DTSC and finalized the Agreement without first discussing the terms with the Non-Settling Parties. *Id.* at 11-12. They also complain that the Agreement absolves Moyer, Plaintiff, and Plaintiff's affiliates from any responsibility for implementation of corrective action, leaving the Generators with the task of implementation. *Id.* at 12. They argue this is prejudicial because Moyer is the party responsible for the contamination, and American Drilling (Plaintiff's affiliate) is the entity continuing to benefit from the Property, so it is unfair for Generators to be the only ones still on the hook for the corrective action. As discussed above, the Generators' share of the contamination is a disputed fact. The court has determined that Moyer's contribution to the remediation fund—covering at least 64% of costs—is reasonably proportional to Moyer's liability. The Generators collectively paid for 50% of the cost of the CMS, a significant contribution that likely would not have been made if they had minimal liability. The

1    record supports that the Generators share some significant responsibility for the contamination.

2    The court has also determined that the release of claims against American Drilling is reasonably

3    proportional to its apparently minimal potential liability.  As such, the Agreement does not suggest

4    collusion or bad faith.

5        Furthermore, a finding of good faith does not require the Settling Parties to have involved

6    the Non-Settling Parties in every step of the settlement negotiations.  The Settling Parties

7    negotiated the terms at arm's length, involving years of mediation followed more recently by

8    multiple settlement conferences before the Honorable Lisa J. Cisneros, all of which the Non-

9    Settling Parties also attended.  Reply 12; Supp. O'Hara Decl. ¶ 10.  A global settlement apparently

10   could not be reached, and the Settling Parties and DTSC reached their own agreement.  Reply 13;

11   Supp. O'Hara Decl. ¶ 10.  This does not suggest collusion.  The Agreement was also subject to

12   public comment from October 30, 2024 to December 3, 2024, and no comments or objections

13   were registered, not even by the Non-Settling Parties.  McCreary Decl. ¶ 4.

14       The Non-Settling Parties' arguments do not contravene the court's finding that the amount

15   paid in settlement is roughly proportional to the liability of the settlers.  The court determines that

16   the settlement meets the requirements of good faith under California Code of Civil Procedure

17   sections 877 and 877.6 and under the *Tech-Bilt* factors.

18       **B.    Application of CERCLA's Objectives**

19       The Non-Settling Parties argue that the settlement is inconsistent with the policy objectives

20   of CERCLA.  "CERCLA was intended to promote the timely cleanup of hazardous waste sites,

21   ensure that polluters were held responsible for the cleanup efforts, and encourage settlement

22   through specified contribution protection."  *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710

23   F.3d 946, 956 (9th Cir. 2013).  The Non-Settling Parties contend that the Agreement would not

24   result in a "timely cleanup" of the Property because it fails to provide a provision for remedy

25   implementation, and it also does not identify a responsible party for remediation and proper

26   expenditure of funds or a process for establishing the terms of the QSF trust.  Opp'n 14.  The Non-

27   Settling Parties assert that DTSC will likely tap one or more of the Generators to manage the

28   remediation and expenditure of funds, but "no generator would willingly take on such role,"

United States District Court
Northern District of California

18

1    leading to protracted litigation about the Generators' proportional liability. *Id.* at 14-15. In the

2    event that DTSC is unable to enforce remediation against any of the Generators, they argue that

3    there would be nobody left to manage the use of the QSF because the only two indisputably liable

4    parties—Moyer and Plaintiff (and its affiliates)—would have been released. *Id.* at 15. The likely

5    result, according to the Non-Settling Parties, will be that the QSF funds will "sit in limbo," and no

6    remediation will ever be completed. *Id.*

7         The court is not persuaded by the dire predictions of the Non-Settling Parties. To the

8    extent the Agreement is vague about the process of creating the QSF, that vagueness does not

9    appear to be cause for concern. The Agreement provides that the QSF must be ready to receive

10   Moyer's payment within 30 days of a final ruling on the determination of good faith settlement.

11   Agmt. § 1(b). In light of this deadline, Plaintiff and DTSC are expected to move quickly to

12   establish the QSF. In fact, they have already identified an entity to act as the administrator of the

13   QSF, and the Non-Settling Parties raise no objections to that administrator. Opp'n 16; Supp.

14   O'Hara Decl. ¶¶ 2-4. The Agreement also provides that the Settling Parties shall "have no control

15   over, or recourse to, the QSF Funds." *Id.* § 1(a). There is no suggestion that Plaintiff might create

16   a QSF with improper terms. At the hearing, the Non-Settling Parties did not raise any concern that

17   the funds would be used for a purpose other than remediation at the Property. And crucially, the

18   Agreement *does* identify a party to be responsible for the remediation and proper expenditure of

19   funds: DTSC. *Id.* The Non-Settling Parties do not argue that DTSC is incapable of doing so.

20   They merely assert that DTSC is likely to delegate the task to someone else, and the Non-Settling

21   Parties believe they should not have to be that someone else. Opp'n 14.

22        As discussed above, all parties appear to agree that Plaintiff is not likely to be found liable

23   for contaminating the Property because it was never an owner. This is borne out by the fact that

24   Plaintiff was not named as a respondent by DTSC in the 2013 Consent Agreement. As to

25   Plaintiff's affiliate American Drilling, the record suggests it bears little if any responsibility for the

26   contamination. It is far from established fact that Moyer is solely liable for the contamination at

27   the Property. Rather, many disputes still exist between the Settling Parties and the dozens of

28   Generators about their proportional fault. There were 60 respondents to the 2012 Enforcement

United States District Court
Northern District of California

1    Order and over 40 respondents to the 2013 Consent Agreement.  It is unlikely that DTSC would

2    be unable to enforce a remediation action against *any* of these identified parties other than Moyer

3    and Plaintiff.  Without the Agreement, protracted litigation may occur no matter who DTSC

4    appoints as the responsible party for remediation.  On the other hand, with the Agreement, there

5    will already be an established fund to cover most—possibly all—of the remediation costs, and the

6    Settling Parties will not be able to bring further challenges contesting the apportionment of fault or

7    the type of appropriate remediation.  The Agreement pushes the cleanup effort forward, not

8    backward.  This is consistent with the policy objectives of CERCLA.

9         The Non-Settling Parties' remaining objection is that Moyer has never validated the

10   exhaustion of its insurance limit.  Opp'n 15.  They argue that, in the event remediation costs

11   exceed the amount in the QSF, Moyer would have been improperly released from liability,

12   contravening the purpose of CERCLA to hold polluters "responsible for the cleanup efforts."

13   *Chubb Custom*, 710 F.3d at 956.  As discussed above, it is not a settled fact that Moyer is liable

14   for 100% of remediation costs, and the $1.7 million settlement is roughly proportional to its

15   contributory fault for the purposes of a good faith settlement under CERCLA.

16        The court concludes that the Agreement is fair, reasonable, and consistent with the policy

17   objectives of CERCLA.  *See City of Tucson*, 761 F.3d at 1011-12.

**IV.    CONCLUSION**

19        The court finds that the Agreement between Plaintiff, Moyer, and DTSC was reached in

20   good faith, and is fair, reasonable, and consistent with CERCLA's policy objectives.

21        Plaintiff's and Moyer's claims against each other are dismissed with prejudice.  Moyer's

22   cross-claims against Cross-Defendants for contribution and indemnity are barred.  Renesas's

23   counterclaim against Moyer for contribution is barred.

24        The court denies the Settling Parties' request to retain jurisdiction over the settlement.

25   //

26   //

27   //

28   //

United States District Court
Northern District of California

As there are no remaining claims in this case, this action is closed.

**IT IS SO ORDERED.**

Dated: May 1, 2025

_____
Donna M. Ryu
Chief Magistrate Judge

United States District Court
Northern District of California